## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

F:A J. KIKSON, )
    a Swedish corporation, )
JEAN KIKSON, )
    a foreign citizen, )
KEVIN STEWART, )    Case No. 02 C 8265
    an individual residing in Virginia, )
    )    Hon. Ronald Guzman
    Plaintiffs, )
    )
    v. )
    )
UNDERWRITERS LABORATORIES, INC., )
    a not-for-profit Delaware corporation, )
    )
    Defendant. )

FILED
NOV X 3 2003
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

DOCKETED
NOV 5 2003

### UNDERWRITERS LABORATORIES INC.'S
### ANSWER TO PLAINTIFFS F:A J. KIKSON'S,
### JEAN KIKSON'S, AND KEVIN STEWART'S MOTION FOR JUDGMENT

Underwriters Laboratories Inc., (UL) by and through its attorneys, Bell, Boyd & Lloyd

LLC, answer the Motion for Judgment of Plaintiffs F:A J. Kikson, Jean Kikson, and Kevin

Stewart (collectively "Kikson") as follows:

### Summary of Plaintiffs' Claim

This is a multi-count action for common-law fraud, conspiracy, negligence, violation of
confidentiality, misappropriation of trade secrets, and defamation arising out of UL's deliberate
sabotage of a revolutionary chimney liner known as "Eldfast".

Swedish inventor Jean Kikson is the owner of Eldfast. Kevin Stewart is his partner here
in North America. Having passed all regulatory and product-safety testing and having been
widely successful in Europe for many years, it was time to bring Eldfast to America. About two
years ago, the Plaintiffs contacted UL to safety test and list Eldfast for application in the United
States and Canada. Plaintiffs asked UL to evaluate Eldfast as a chimney liner to the applicable
requirements of "UL 1777" - UL's standard for chimney liners. UL is the undisputed "world
leader" in product-safety testing and certification, and holds a veritable monopoly over all others
in this area. UL's brand is so strong that without a UL listing, Plaintiffs are unable to distribute
Eldfast in North America. As UL knows, no one will purchase rights to distribute Eldfast or buy
Eldfast directly without a UL mark.

Through fraud, conspiracy, gross incompetence, and reckless neglect, UL gravely injured Plaintiffs in their trade and business and intentionally denied Plaintiffs access to the North American markets. The "testing" of Eldfast over the last two years was a sham. UL knowingly and repeatedly disregarded its own standards and specifications, intentionally botched its own tests, applied faulty test procedures, compromised the test area, and lied to Plaintiffs about the need for a special "new" "standard" for Eldfast. In an attempt to use sheer mass and money to attrite and crush every effort to bring Eldfast to North America, UL forced the Plaintiffs to expend hundreds of thousands of dollars attempting to correct UL's "mistakes" and obtain a UL-1777 listing. In truth, UL never intended to properly test Eldfast or to allow Eldfast to be distributed in North America. UL intended to delay the matter until the industry gave up on Plaintiffs. UL's fraud, reckless incompetence and grossly negligent handling of the testing of Eldfast has drained the Plaintiffs of resources and has completely discredited Kikson and Stewart in the industry. UL knew that by sabotaging the product at the testing stage Eldfast would never be accepted. UL knew that it had more money and more influence than Kikson and Stewart. UL set Kikson and Stewart up to fail from the beginning.

Two years ago, the Plaintiffs had an extensive list of over 100 customers ready to purchase Eldfast and distribute the product throughout North America. Because of UL's actions, no one will touch the product. Plaintiffs have lost their opportunity to capture the massive North American market for chimney liners.

**Response:**

UL denies the allegations contained in the Summary of Plaintiff's claim.

### Eldfast

1.      Plaintiff, Jean Kikson ("Kikson"), lives in Stockholm, Sweden. Kikson invented Eldfast in 1992 and owns all rights in and to the product. Plaintiff, Kevin Stewart ("Stewart"), lives in Richmond, Virginia. Stewart is a chimney sweep. Kikson and Stewart did business under the trade name "LandyVent".

**Response:**

UL lacks information sufficient to admit or deny the allegations of Paragraph 1.

2.      Eldfast is a non-metallic, ceramic-based chimney liner/repair material, intended for installation in residential/domestic solid fuel, coal, wood, gas or oil burning heating appliances, including open fires and multifuel stoves. Eldfast can also be used for lining chimneys serving commercial and light industrial fuel burning appliances. Eldfast is designed to provide a fireproof, gastight and exceptionally hard wearing lining to the flue within a masonry built chimney. Eldfast does four (4) main things: it reinforces, withstands high temperatures, adds acid resistance, and seals cracks and fills fallen joints.

**Response:**

UL lacks information sufficient to admit or deny the allegations of Paragraph 2.

3.     Eldfast is manufactured in Sweden and England by Plaintiff, F:a J. Kikson, a Swedish corporation owned by Kikson.  Since 1992, Kikson has been selling and distributing Eldfast to customers across Europe.  Eldfast is widely accepted as "the" chimney liner in Europe. Since 1992, Kikson has earned a steady profit from the sale of Eldfast.

**Response:**

UL lacks information sufficient to admit or deny the allegations of Paragraph 3.

4.     Independent testing carried out to International Standard ISO 4736 confirms that Eldfast can withstand chimney fire conditions of 1,050°C.

**Response:**

UL lacks information sufficient to admit or deny the allegations of Paragraph 4.

5.     In 1999, Eldfast was tested for product safety by the Building Services Research and Information Association ("BSRIA") in England.  BSRIA is the United Kingdom's leading center for building services and product safety research.  BSRIA constructed a proper test chimney.  Eldfast passed all tests, including the gaslightness, heat resistance (700°C flue gas temperature), sootfire resistance (1000°F flue gas temperature), abrasion resistance and deformation check tests.  BSRIA published its Report 15024/1.

**Response:**

UL admits Eldfast was tested by BSRIA.  UL lacks sufficient information to admit or

deny the remaining allegations of Paragraph 5.

6.     Eldfast is a listed chimney liner in England, Northern Europe and elsewhere.

**Response:**

UL lacks information sufficient to admit or deny the allegations of Paragraph 6.

### Underwriters Laboratories

7.     Defendant, Underwriters Laboratories, Inc. ("UL"), is a private, product safety testing and certification organization.  UL persistently transacts business in Virginia and derives substantial revenue from Virginia businesses, including Plaintiffs and their companies.  UL holds itself out to the public as a "conformity assessment provider".  UL claims that its services extend to helping companies achieve "global acceptance".  UL suggests that "historically, our focus has been on serving international customers who want to sell products in the U.S. market."

**Response:**

UL admits it is a not-for-profit product safety testing and certification organization with its principal place of business in Northbrook, Illinois and is qualified to do business in Virginia. UL further admits it is a provider of conformity assessment services. UL denies the remaining allegations of Paragraph 7.

8.      UL charges customers to test products. Although UL holds itself out as "not-for-profit" enterprise, UL's revenues exceeded $500,000,000.00 in 2001. UL conducted 108,296 product evaluations. More than 17 billion UL marks were applied to products worldwide. Ninety-four (94%) of UL's business involved the listing of products. Seventy-one percent (71 %) of its revenue was derived from the United States and Canada.

**Response:**

UL admits as a not-for-profit organization that it is supported by charges for tests and examinations established on the basis of the costs for such services. UL also admits 2001 revenue exceeded $500,000,000.00. UL denies the remaining allegations of Paragraph 8.

9.      UL employs "engineers" who are responsible for managing the customer relationship. Under the engineers are UL's "test technicians". UL represents that its test technicians are trained precisely for the kinds of testing UL does. UL holds itself out as an "expert" is product-safety testing,

**Response:**

UL admits that it employs engineers and represents itself to be an expert with respect to the testing of products to determine compliance with its Standard and Requirements. UL also admits it employs laboratory technicians. UL denies the remaining allegations of Paragraph 9.

10.     UL has developed more than 840 standards for safety. According to UL, its standards are "essential" to helping insure public safety and confidence, reduce costs, improve quality and market product and services.

**Response:**

UL admits that it is involved in the development and publishing of UL Standards for Safety. UL denies the remaining allegations of Paragraph 10.

11.     On March 13, 1996, UL announced the publication of the third edition of the Standard for Safety Chimney Liners, UL 1777 ("UL 1777").

**Response:**

UL admits that the third edition of UL 1777 was published April 5, 1996.

12.     UL 1777 covers metallic and non-metallic chimney liners intended for field-installation into new or existing masonry chimneys that are used for the natural draft venting of gas, liquid and solid fuel-fired, residential-type appliances in which the maximum continuous flue-gas outlet temperatures do not exceed 1000°F (538°C).

**Response:**

UL admits the allegations of Paragraph 12.

13.     It is practically and commercially impossible to sell any chimney liner in North America without obtaining a listing from UL that the product has been tested in accordance with UL-1777.

**Response:**

UL denies the allegations of Paragraph 13.

## The First "Test"

14.     In August 2000, Kikson first contacted UL to test Eldfast to UL-1777.

**Response:**

UL denies the allegations of Paragraph 14.

15.     UL knew that the Plaintiffs had many potential customers for Eldfast in the United States and Canada. UL knew that Plaintiffs were ready, willing and able to immediately get their product tested and listed and on the North American markets for sale.

**Response:**

UL denies the allegations of Paragraph 15.

16.     UL represented to Kikson that since UL cooperated with BSRIA, it would be less costly to do the UL-1777 test in England. Accordingly, Kikson's agent in England made application to UL for the listing of Eldfast as a chimney lining system. Plaintiffs paid UL a deposit of $6,000.

**Response:**

UL denies the allegations of Paragraph 16.

17.     UL made plans to test Eldfast in England. UL represented to Kikson that it provided BSRIA with copies of UL-1777 and other documentation necessary for BSRIA to carry out the test.

**Response:**

UL denies the allegations of Paragraph 17.

18.     Upon arrival at BSRIA for the test, UL's representative, Robert Zimmerman ("Zimmerman"), informed Kikson that the specifications provided by UL for construction of the test chimney had not been followed. Zimmerman noted four items with the test chimney that, in Zimmerman's own words, "needed to be corrected *__prior to__* the conduct of the Temperature Testing." (Emphasis added). These items were:

- The liner connector from the flue gas generator outlet to the chimney inlet was less than required by UL-1777.

- The number of thermocouples that were located within the test setup were less than was required by UL-1777 .

- The mounting of the thermocouples was not in accordance with UL-1777. The thermocouples were taped to the surface of the wood with a piece of duct tape instead of the proper method.

- The brick that was used to fabricate the test chimney was an "engineered type" brick. The proper brick that should have been used was a "common brick, such as is used in most residential installations within the U.S.

**Response:**

UL admits that Zimmerman informed BSRIA that the specifications provided by UL regarding the chimney had not been followed.  UL also admits that the liner connector from the flue gas generator outlet to the chimney inlet was less than required by UL-1777, the number of thermocouples that were located within the test setup were less than was required by UL-1777, and the mounting of the thermocouples was not in accordance with UL-1777, which needed to be corrected before conducting the temp test.  UL otherwise denies the remaining allegations of Paragraph 18.

19.     UL knew about these problems before conducting any test.

**Response:**

UL denies the allegations of Paragraph 19.

20.     UL unilaterally decided to proceed with the test, knowing the test chimney violated UL standards. UL conducted the test knowing that the chimney was defective and that the product could not possibly pass.

**Response:**

UL denies the allegations of Paragraph 20.

21.     Prior to the test, UL knew that the engineered-type brick was compact (nonporous and not able to take thermal shock), brittle, and would create a hotter condition within the test assembly.

**Response:**

UL denies the allegations of Paragraph 21.

22.     UL should not have proceeded with the test, but it did.

**Response:**

UL denies the allegations of Paragraph 22.

23.     Plaintiffs had nothing to do with any of the problems with the construction of the test chimney. These problems were caused by UL and a total miscommunication with BSRIA

**Response:**

UL denies the allegations of Paragraph 23.

24.     The test proceeded and Eldfast failed because of the very problems which UL knew about before the test.

**Response:**

UL denies the allegations of Paragraph 24.

25.     UL billed Plaintiffs for the defective test chimney.

**Response:**

UL denies the allegations of Paragraph 25.

26.     UL then stated that the testing should occur in the United States, where things could be carried out "the right way".

**Response:**

UL denies the allegations of Paragraph 26.

### The Second "Test"

27.     UL knew from the beginning that in order to demonstrate compliance as a chimney liner under UL-1777, Eldfast had to be applied to the interior of a properly constructed brick and mortar chimney.

**Response:**

UL denies the allegations of Paragraph 27.

28.     Upon information and belief, UL had tested numerous chimney liners prior to August 2000.

**Response:**

UL admits that it has tested chimney liners prior to August 2000.

29.     UL knew or should have known how to construct a proper test chimney.

**Response:**

UL denies the allegations of Paragraph 29.

30.     UL decided to test Eldfast at its headquarters in Northbrook, Illinois.

**Response:**

UL admits that Eldfast was tested at its headquarters in Northbrook, Illinois.

31.     UL assumed full responsibility for construction of the test chimney, and hired a subcontractor.

**Response:**

UL admits it hired a contractor to construct a test chimney. UL denies the remaining allegations of Paragraph 31.

32.     UL assigned Raymond M. Sanders ("Sanders") to be the engineer on the project. Unbeknownst to Plaintiffs, Sanders was inadequately trained by UL and was completely incompetent to carry out the UL-1777 testing. UL also concealed from Plaintiffs the fact that Sanders had been kicked off many other projects.

**Response:**

UL admits Sanders was the engineer assigned to the project. UL denies the remaining allegations of Paragraph 32.

33.     One of Sanders first acts was to notify Plaintiffs that UL demanded an additional $25,000 to test Eldfast.

**Response:**

UL denies the allegations of Paragraph 33.

34.     Upon arrival at UL on February 19, 2001, Sanders showed Plaintiffs the chimney that was to be used for the test. Plaintiffs' immediately observation was the size of the mortar joints between the brickwork. Both horizontal and vertical joints were, on average, two (2) inches or more. Plaintiffs also noticed that the test chimney was constructed with 0" clearance to combustibles, instead of the agreed-upon 1" clearance.

**Response:**

UL admits that some horizontal and/or vertical joints of the chimney were more than 2 inches wide and the chimney constructed with 0" clearance to combustibles. UL denies the remaining allegations of Paragraph 34.

35.     Plaintiffs were not given a copy of UL-1777. A representative of LandyVent, Eric Bramfitt ("Bramfitt"), pointed out that he was surprised at the method of construction. Sanders indicated no surprise at all, and brushed off Plaintiffs' inquiries.

**Response:**

UL denies the allegations of Paragraph 35.

36.     Sanders told Bramfitt that a chimney cap was needed for the test. This came as a total surprise. A week before, Sanders had told Kikson that Kikson did not have to bring a cap. UL did not even have a chimney cap at its facility. As a result of Sanders' comments, Kikson and Bramfitt went to a local Home Depot and purchased the one and only cap of suitable dimensions.

**Response:**

UL admits plaintiffs were informed that a chimney cap was required in conjunction with certain tests conducted in accordance with UL Standard 1777. UL denies the remaining allegations of Paragraph 36.

9

37.     UL agreed there was a problem with the clearance to combustibles. After purchasing the chimney cap, Kikson and Bramfitt spent two (2) days rebuilding the surrounding combustibles to 1" and lining the test chimney with Eldfast, oblivious to the many problems with the test chimney that were concealed by Sanders and UL.

**Response:**

UL denies the allegations of Paragraph 37.

38.     UL intentionally disregarded industry custom and practice in the construction of the second test chimney. The test chimney was defective for many reasons. The first problem was the mortar joint size. As noted above, the mortar joints averaged two (2) inches in width, instead of the $3/8 \pm 1/8$ inch actually specified in UL's own standard. Sanders deliberately concealed the UL specification from Kikson and diverted Plaintiffs' attention by refusing to provide a copy of UL-1777 and raising the chimney cap issue.

**Response:**

UL denies the allegations of Paragraph 38.

39.     Even more significant than the mortar joint size issue, however, UL only allowed the chimney to cure for ten (10) days! This fact was totally concealed by Sanders.

**Response:**

UL denies the allegations of Paragraph 39.

40.     Even though UL-1777 does not specify a cure period, industry custom and practice (which UL represents that it follows) is to allow a chimney to cure for at least twenty-eight (28) before lining it or using it in any way.

**Response:**

UL admits UL1777 does not specify a cure period.  UL denies the remaining allegations

of Paragraph 40.

41.     Indeed, Eldfast has never failed on any chimney that has been allowed to cure for the customary period.

**Response:**

UL lacks information sufficient to admit or deny the allegations of Paragraph 41.

42.     After lining the test chimney with Eldfast, Kikson asked UL for a heat source so he could accelerate the curing time of the Eldfast material. Kikson never imagined that the test chimney itself was not cured.

**Response:**

UL admits Kikson requested a heat source to accelerate the curing time of the Eldfast material. UL denies the remaining allegations of paragraph 42.

43.     UL claimed that it did not have a heater.

**Response:**

UL lacks information sufficient to admit or deny the allegations of Paragraph 43.

44.     As of February 23, 2001, the Eldfast was still not properly cured.

**Response:**

UL lacks information sufficient to admit or deny the allegations of Paragraph 44.

45.     UL represented to Plaintiffs and agreed to provide heat to the test chimney over the weekend and that the test would be carried out on February 26, 2001.

**Response:**

UL lacks information sufficient to admit or deny the allegations of Paragraph 45.

46.     Bramfitt arrived on February 26, 2001 and discovered that UL had failed to apply any heat for curing over the weekend. In fact, UL had already started the test. Bramfitt sat back and watched.

**Response:**

UL admits Bramfitt arrived February 26, 2001 and witnessed testing at UL. UL admits no external heat source was applied to the chimney. UL denies the remaining allegations of Paragraph 46.

47.     During the first two (2) hours of the test at 1,000°F, it became apparent that something was not right with the readings of the thermocouples. They were reading unusually high and erratic. The thermocouples recorded temperatures over the acceptable limit above ambient. Bramfitt noticed a jet of steam emitting from the plywood combustible material that encased the test chimney. Close inspection showed that the duct tape UL used to tape and seal all joints was saturated with moisture and had lost its adhesion. Further inspection revealed that the plywood itself was also substantially saturated.

**Response:**

UL denies the allegations of Paragraph 47.

48. Bramfitt then asked how long the test chimney had been allowed to cure before Plaintiffs arrived for the test. UL's senior test technician informed Bramfitt that the chimney had only been allowed to cure for ten (10) days. Bramfitt informed UL's technician that ten (10) days was nowhere near long enough to allow a brick and mortar chimney to cure, especially given the excessive size of the mortar (water-based) joints. This appeared to come as a complete surprise to the UL senior technician.

**Response:**

UL denies the allegations of Paragraph 48.

49. Sanders was so ignorant that he considered the test chimney ready for use after it had only cured for ten (10) days.

**Response:**

UL denies the allegations of Paragraph 49.

50. Plaintiffs learned that Sanders had instructed that the test should proceed, in spite of the known lack of cure time.

**Response:**

UL denies the allegations of Paragraph 50.

51. UL concealed from Plaintiffs the fact that the test chimney had only been allowed to cure for ten (10) days. Plaintiffs would never have allowed the test to proceed had he known that the chimney was still holding water.

**Response:**

UL denies the allegations of Paragraph 51.

52. UL's actions ensured that Eldfast failed the test. The defective mortar joints, the lack of cure time, and UL's sealing of the air cavity between the brick veneer and the plywood encasement caused significant non-compliant temperature results. During the test, the chimney steamed like a pressure cooker, so violently that the combustibles had to be ripped off and the test abandoned.

**Response:**

UL denies the allegations of Paragraph 52.

53. When told about the problems, Sanders did not even react.

**Response:**

UL denies the allegations of Paragraph 53.

54.     UL offered no explanation or excuse for its actions.

**Response:**

UL denies the allegations of Paragraph 54.

55.     Incredibly, UL billed Plaintiffs for the defective chimney construction and testing and billed Plaintiffs for the cost of re-building the combustibles (even though that work was done by Plaintiffs themselves!).

**Response:**

UL denies the allegations of Paragraph 55.

56.     Plaintiffs would later find out that UL's contractor only charged UL half the cost of the chimney to UL because of the defects, yet UL fraudulently charged the full amount to the Plaintiffs.

**Response:**

UL denies the allegations of Paragraph 56.

57.     When Plaintiffs later complained about the bill, UL promised to construct another chimney as a replacement for the defective one. UL also requested a complete refund of the chimney cost from its contractor. The contractor agreed.

**Response:**

UL denies the allegations of Paragraph 57.

58.     Still, Plaintiffs had no UL listing and Eldfast was in limbo. Kikson immediately contacted UL about its intentions. It was decided by UL to re-commence testing on March 5, 2001.

**Response:**

UL admits Eldfast was not UL Listed.  UL denies the remaining allegations of Paragraph 58.

### The Ambient Temperature Scheme

59.     On March 5, 2001, Bramfitt arrived at UL to again find that the testing was already underway.

**Response:**

UL admits testing occurred March 5, 2001. UL lacks information sufficient to admit or deny the remaining allegations of Paragraph 59.

60.     This time, UL had another trick up its sleeve. UL manipulated "ambient" temperature to falsify the testing.

**Response:**

UL denies the allegations of Paragraph 60.

61.     After four (4) hours of testing at 1,000°F, UL indicated that the heat transference had exceeded "acceptable" levels beyond "ambient" (which UL "determined" was 79°F). The test was stopped.

**Response:**

UL lacks information sufficient to admit or deny the allegations of paragraph 61.

62.     It was decided to redo the test the following day at 570°F (the gas and oil test). After four (4) hours of testing, some of the thermocouples registered a few degrees above UL's acceptable fixed limit above "ambient". "Ambient" was still represented to be fixed at 79°F.

**Response:**

UL admits Eldfast was tested for use with oil fired appliances.   UL lacks information to

admit or deny the remaining allegations of Paragraph 62.

63.     The gas test (run at 470°F above ambient) was conducted the following day. This time, ambient was "determined" by UL to be 74°F. Heat was applied to the flue at a temperature of 544°F for a full eight (8) hours. At the end of the test, three (3) thermocouples out of over thirty (30) registered between 2° and 5°F above acceptable ambient temperature.

**Response:**

UL lacks information sufficient to admit or deny the allegations of Paragraph 63.

64.     Bramfitt asked for clarification regarding UL's ambient temperature. Sanders then informed Bramfitt that "ambient" temperature, according to UL, was permitted to vary from 70° to 90°F. Bramfitt informed Sanders that this was "crazy": to have such a variable ambient temperature range, yet a fixed ambient temperature limit "above ambient". If, for instance, ambient temperature for the gas test had been 79°F, as it was during the first and second days of testing, then the three (3) thermocouple readings would have been within the acceptable limit. However, Sanders lowered "ambient" on the third day to 74°F. The "sliding" ambient temperature scale was flawed for other reasons. If the ambient temperature had been 89°F or 90°F, what would have been the results of tests on other products? Stainless steel tested in the

summer, for example, would have produced higher thermocouple readings that stainless steel tested in the winter.

**Response:**

UL admits UL 1777 permits the ambient temperature to be between 70° and 90° F. UL denies the remaining allegations of Paragraph 64.

65. Sliding and changing the ambient temperature in the middle of the test made the "test" a veritable shell game.

**Response:**

UL denies the allegations of Paragraph 65.

66. Sanders was not even present for all the testing. Sanders was unable to explain or even comment on the discrepancies.

**Response:**

UL lacks information sufficient to admit or deny the allegations of Paragraph 66.

67. Bramfitt also pointed out to Sanders that during the test the door to the fire tower could not be closed due to equipment that was being used for future testing of another material for someone else that was blocking the door. Sanders knew the door was open. Towards the end of the test, Bramfitt noticed that a considerable draft was blowing through the test area (which affected ambient temperature significantly). Bramfitt and UL's test technician looked around for a piece of plywood with which to seal the opening, but to no avail.

**Response:**

UL denies the allegations of Paragraph 67.

68. Bramfitt further pointed out to Sanders the problem with the chimney cap and how that affected temperatures within the test chimney. The cap purchased from Home Depot greatly restricted the egress of heat from the chimney.

**Response:**

UL lacks information sufficient to admit or deny the allegations of Paragraph 68.

69. In reply to Bramfitt's comments and questions concerning UL's ambient temperature system, Sanders stated that if the ambient temperature were raised, then it would also raise the temperature of the air that was in the cavity between the veneer and the encasement. Sanders statement was untrue, idiotic and nonsensical. Bramfitt realized Sanders was completely incompetent in carrying out the tests. He demanded to speak with Zimmerman.

**Response:**

UL denies the allegations of Paragraph 69.

70.     Zimmerman called Bramfitt in Virginia on March 11, 2001, and suggested that Plaintiffs contact Kuscsik to discuss an "appeal" of the test and test procedures.

**Response:**

UL admits that Zimmerman spoke to Bramfitt suggesting he appeal the test results to

Kuscsik. UL denies the remaining allegations of Paragraph 70.

71.     Kuscsik called on March 12, 2000. Kuscsik admitted that the size of the mortar joints did not conform to UL-1777 specifications. Kuscsik stated that the mason who constructed the test chimney had drastically increased the size of the joints to avoid having to cut the brick (a fact that was also concealed from Plaintiffs).

**Response:**

UL admits Kuscsik spoke with one of the Plaintiffs and acknowledged that the size of

some mortar joints were not as specified in UL 1777. UL denies the remaining allegations of

Paragraph 71.

72.     Kuscsik agreed with Bramfitt that the test never should have been conducted in the first place. Bramfitt posed several questions to Kuscsik, which went unanswered:

- Why were both Bramfitt and Kikson induced to travel to Chicago, when UL's chimney was not built to UL specifications?

- Why were both Bramfitt and Kikson induced to travel to Chicago, when UL's test chimney was not properly cured?

- Why did UL not disclose to Kikson or Bramfitt the defects in the test chimney?

- Why did UL wedge open the doors to the fire tower and undermine the interior ambient temperature during the test?

- Why did Sanders tell Kikson he did not need to bring a chimney cap to the test (Kikson had a cap that fully conformed to UL standards), and then, upon arrival, notify Kikson that he needed a cap?

**Response:**

UL denies the allegations of Paragraph 72.

16

73.     Because of the defects with the chimney and the serious questions about UL's test procedures and the compromised condition of the test area, UL represented to the Plaintiffs that it would build a proper test chimney and test Eldfast anew.

**Response:**

UL denies the allegations of Paragraph 73.

74.     UL concealed the fact that it intended to bill the Plaintiffs for its own blunders.

**Response:**

UL denies the allegations of Paragraph 74.

### The Third "Test"

75.     After disregarding its own specifications and industry custom and practice for construction of a test chimney and intentionally interfering with the test, UL then represented to Kikson and Stewart that UL would have to develop a new "standard for testing" a product "such as Eldfast".

**Response:**

UL denies the allegations of Paragraph 75.

76.     Rather than addressing UL's shortcomings, Kuscsik emailed Bramfitt and stated that UL "would like to discuss further your view on evaluating your product as a 'repair' system and not a 'liner' system."

**Response:**

UL admits that it stated UL " would like to discuss further your view on evaluating your product as a 'repair' system and not a 'liner' system." UL denies the remaining allegations of Paragraph 76.

77.     UL emphasized that Eldfast would still be evaluated under UL-1777, but under a new standard "to be developed." UL called the new standard "UL-1777A".

**Response:**

UL admits it was willing to evaluate and test Eldfast as a chimney repair system, not a chimney liner, and established requirements outlines in document UL 1777A. UL denies the remaining allegations of Paragraph 77.

78.    UL never explained why a "new" standard was necessary, and Plaintiffs submit that it was not. The "new standard" was subterfuge. UL knew that Eldfast would pass UL-1777, but would never allow it to be properly tested to the standard.

**Response:**

UL denies the allegations of Paragraph 78.

79.    Plaintiffs accepted UL's representations, as it appeared (at the time) that UL intended to issue a listing if Eldfast passed the UL-1777A test. UL misled Plaintiffs into believing that passing "UL-1777A" would lead to a UL listing.

**Response:**

UL denies the allegations of Paragraph 79.

80.    The "new standard" developed by UL consisted of taking UL-1777 and removing the heat conductivity part of the test only.

**Response:**

UL denies the allegations of Paragraph 80.

81.    UL agreed that the testing would be carried out on a newly constructed chimney built to the correct UL specifications.

**Response:**

UL admits testing would be conducted on a newly constructed chimney.  UL denies the remaining allegations of Paragraph 81.

82.    On July 23, 2001, UL notified Bramfitt that the masonry test chimney "has now been completely cured". UL also asked for "all materials" used in Eldfast, including its component parts, etc. UL also requested more money to carry out the test.

**Response:**

UL lacks information sufficient to admit or deny the allegations of Paragraph 82.

83.    On August 30, 2001, UL confirmed that it was "aware" of the Plaintiffs need "to have this project completed as soon as possible". UL requested further proprietary information from Kikson concerning Eldfast.

**Response:**

UL lacks information sufficient to admit or deny the allegations of Paragraph 83.

84.     After the first and second debacles, the Plaintiffs thought that UL would finally build a proper test chimney. UL had different intentions. UL built a chimney with an eighteen (18) inch chimney flue. UL simply "deemed" this chimney "appropriate for the testing."

**Response:**

UL denies the allegations of Paragraph 84.

85.     It was impossible to evaluate anything on the latest UL's test chimney. The actual flue on this chimney was only four (4) bricks (18 inches) high. UL's own standards state that the height of the "chimney" is to be at least six (6) feet. "Chimney" is defined as the length from the entrance hole for the flue-gas generator to the top. Not only did the 18 inch chimney flue violate UL's own standards, but it did not simulate any field conditions for any existing masonry chimneys anywhere in the world.

**Response:**

UL denies the allegations of Paragraph 85.

86.     UL insisted on proceeding with the four (4) foot chimney. Plaintiffs lined the test chimney with Eldfast. In order to speed up the curing process, an electric coil heater was installed at the bottom of the flue. Because of the problems with Sanders during the second test, and in order to ensure that Sanders did not foil the third test, Plaintiffs physically put a sign in front of the test chimney that read **"DO NOT REMOVE THE HEATER"**. Plaintiffs also verbally instructed Sanders *not* to remove the sign and to allow the test chimney to cure over night.

**Response:**

UL admits testing was conducted using a four foot chimney. UL lacks information sufficient to admit or deny the use of an electric heater to speed up the curing of the Eldfast material. UL denies the remaining allegations of Paragraph 86.

87.     Sanders personally promised to advise UL's test technician and inform him not to remove the heater. Sanders represented to the Plaintiffs that nothing would be done until Plaintiffs arrive the next morning.

**Response:**

UL lacks information sufficient to admit or deny the allegations of Paragraph 87.

88.     When Plaintiffs arrived the next morning to fire the test chimney, not only had the sign been removed, but the heater had been removed as well, **and** the test technician had already applied the gas burner and started the test.

**Response:**

UL admits the testing of the chimney commenced before Plaintiffs arrived. UL lacks information sufficient to admit or deny the remaining allegations of Paragraph 88.

89.     In speaking with UL's technician, Plaintiffs discovered that it was Sanders who had instructed the technician to remove the sign and proceed with the test. Sanders ordered UL's high temperature gas generator to be placed on full blast at over 1000°F.

**Response:**

UL denies the allegations of Paragraph 89.

90.     Plaintiffs told Sanders to stop immediately., but the damage had already been done.

**Response:**

UL denies the allegations of Paragraph 90.

91.     As a result of Sanders' actions, the Eldfast product, which had not had enough time to cure, blistered and "bubbled". The bubbling only occurred because Sanders removed the sign, removed the heater and, again, proceeded with the test without giving Eldfast the requested and agreed-upon time to cure properly.

**Response:**

UL denies the allegations of Paragraph 91.

92.     UL even admitted that Sanders had informed UL that he had "some recollection of a sign of some sort".

**Response:**

UL lacks information sufficient to admit or deny the allegations of Paragraph 92.

93.     Repairs were done to the bubbled areas and the test was finished. Eldfast passed the testing.

**Response:**

UL denies the allegations of Paragraph 93.

94.     Although Eldfast remained intact and held all combustible gases as per the UL-1777 test, Sanders now claimed he could hear a "hollow" sound at the repaired spots "when lightly tapped with a screw driver". Sanders made no comment about the other areas of the test chimney, where Eldfast had succeeded and there was no "hollow" sound.

**Response:**

UL admits the existence of a "hollow"sound at repaired spots in the Eldfast material. UL lacks information to admit or deny the remaining allegations of Paragraph 94.

95.     The "hollow" sound was an excuse fabricated in Sanders' mind. UL feigned "concern" about the bubbling and/or "hollow" noise. On September 24, 2001, Sanders emailed Plaintiffs in Virginia and misrepresented that based upon the hollow sounds "it appears that the material is not adhering to the brick/mortar surface". Sanders did not know whether Eldfast adhered to the brick/mortar surface of the chimney.

**Response:**

UL admits it had concerns regarding the bubbling and hollow sound of the Eldfast material. UL denies the remaining allegations of Paragraph 95.

96.     UL notified Kikson that in order for UL to conduct temperature tests with new Eldfast material, UL would need even more money. UL falsely stated it intended to "evaluate the Eldfast system in the most representative 'real life' conditions as possible."

**Response:**

UL denies the allegations of Paragraph 96.

97.     Plaintiffs believed UL. By this point, the Plaintiffs had committed so much to the UL "testing" that they could not turn back. Plaintiffs did not know that UL had no intention of actually testing the product on a proper test chimney or of giving Eldfast any kind of listing.

**Response:**

UL denies it had no intention of testing Eldfast on a "proper" test chimney or of giving Eldfast any kind of "listing." UL lacks information to admit or deny the remaining allegations of Paragraph 97.

### The Fourth "Test" And The "Clay Flue Tile Liner" Concept

98.     Because of the "hollow" sound, UL suggested for the first time that Eldfast be evaluated as a "repair system" on "clay flue liners liners". Clay flue liners fit inside a chimney and are a form of chimney liner.

**Response:**

UL admits clay flue liners fit inside a chimney and are a type of chimney liner. UL otherwise denies the remaining allegations of Paragraph 98.

99.     Other than some vague reference to the "hollow" sound, UL never informed Plaintiffs why it wanted to test Eldfast on clay flue tile liners. Clay flue liners are not mentioned in or required by UL-1777, and UL had never tested any chimney lining product against clay flue tile liners.

**Response:**

UL admits clay flue liners are not mentioned in or required by UL 1777. Upon information and belief, UL admits it has not tested any "chimney lining product" against clay flue tile liners. UL denies the remaining allegations of Paragraph 99.

100.    Stephen Kuscsik of UL (Sanders' boss) suggested that two (2) chimneys be constructed: one with masonry brick only (the UL-1777 chimney), and the other with clay flue tile liners.

**Response:**

UL admits it suggested two chimneys be built; one of only masonry brick (unlined) and the other with a liner of clay tiles. UL otherwise denies the allegations of Paragraph 100.

101.    It was stipulated that an interior flue dimension of 10 x 10 inches would apply for both chimneys.

**Response:**

UL lacks information sufficient to admit or deny the allegations of Paragraph 101.

102.    UL led Kikson and Stewart to believe that two (2) tests would be performed: one under UL-1777 and the other on the clay flue tile liners. UL never informed Kikson and Stewart that Eldfast was *only* being evaluated as a repair system on clay flue tile liners. UL represented that tests would be performed on "two" chimneys.

**Response:**

UL denies the allegations of Paragraph 102.

103.    The brick and mortar test chimney was constructed with the 10 x 10 inch flue area. UL confirmed that the "masonry chimney was cured for not less 28 days prior to application of

the Eldfast". Later, UL would admit that "[o]nce fully cured, the repaired/resurfaced masonry chimney was ready to be tested".

**Response:**

UL lacks information sufficient to admit or deny the allegations of Paragraph 103.

104.   Plaintiffs lined the brick and mortar test chimney and the test commenced. Eldfast passed temperature test for solid-fuel-fired appliances - 1000°F flue gases. Eldfast passed temperature test for solid-fuel-fired appliances - 1400°F flue gases. Eldfast passed the creosote fire test for solid-fuel-fired appliances - 2,100°F flue gases. Eldfast passed the chimney sweep test. Eldfast passed the smoke leakage test. Eldfast passed UL's gas tightness test. Eldfast passed the freeze/thaw analysis test. Eldfast passed the compression/strength test. And, Eldfast passed the thermo-conductivity analysis test.

**Response:**

UL admits that testing of the Eldfast material as a chimney repair system demonstrated compliance with the temperature test for solid fuel fired appliances – 10000 F flue gases, creosote fire test for solid fuel fired appliances – 21000 F, sweep test, smoke leakage test, freezing and thawing test, and strength test.  UL otherwise denies the allegations of Paragraph 104.

105.   The results of the test were unanimous:

- The surfaces of the chimney repair material did not show signs of cracking or deterioration.

- The chimney repair material [Eldfast] did remain in its intended position during the…tests.

- The chimney repair material [Eldfast] did remain securely adhered to the test chimney interior surface.

- The relined test sample did not crack, dislodge, or experience a loss in mass of more than 1.0 percent, when tested.

- The smoke leakage rate did not exceed 2.8 $m^3$/h/m (98.9 $ft^3$/h/ft.).

- The nonmetallic materials in the Eldfast that absorbed water did not show disintegration, cracking, and loss of weight of more than 5% of the initial dry weight after being subject to the freezing and thawing treatment.

- The compressive strength of the samples did not crack or break at 500 psig (in fact, Eldfast did not start cracking until 1300 psig).

- The 1 inch thick Eldfast material provides better thermal resistance than 1 inch concrete.

"Based upon the above, the test results comply with applicable requirements."

**Response:**

UL admits the Eldfast material as a chimney repair system complied with UL Subject 1777A Outline of the Investigation for "Chimney Repair Systems."

106. The testing on the clay flue tile liners was a different matter. When Kikson and Stewart arrived at UL to do the test on the "two" chimneys, they discovered that the chimney with the clay flue tile liner only had a 6 1/2 x 6 1/2 inch flue area, instead of the agreed-upon 10 x 10 inch area, and a nominal thickness of only 5/8 inch.

**Response:**

UL admits the chimney with clay tile flue liners had 61/2 x 61/2/ inch clay liners. UL otherwise denies the remaining allegations of Paragraph 106.

107. Clay flue tiles normally have a nominal thickness of 7/8 inch.

**Response:**

UL lacks information sufficient to admit or deny the allegations of Paragraph 107.

108. As UL knew, the smaller inside dimension of the clay flue tile chimney virtually assured that the flue tiles would crack under extreme heat and pressure. And, if the clay flue tile cracked, it would crack the Eldfast too.

**Response:**

UL denies the allegations of Paragraph 108.

109. Kikson and Stewart were astounded by the failure to properly construct the clay flue tile test chimney. Having expended so much money dealing with UL's intentional deviations and outright sabotage of the second and third tests, Kikson and Stewart had no choice but to proceed with the fourth test on the clay flue tile liners "as was", and hope for the best. Kikson and Stewart knew that Eldfast was also being tested on the brick and mortar test chimney, and they knew Eldfast would pass the test on a properly constructed chimney, so they were less concerned about the flue dimensions on the clay flue tile liner test chimney. UL advised that it wanted to proceed with the test immediately. Accordingly, Kikson agreed to change the Eldfast composition so as to provide a much quicker cure time.

**Response:**

UL denies the allegations of Paragraph 109.

110.    Not surprisingly, the clay flue tile liner cracked during the test.

**Response:**

UL admits some of the clay flue tile liners were cracked following listing of the Eldfast

material. UL otherwise denies the allegations of Paragraph 110.

111.    Throughout the two-year testing ordeal, UL never allowed Eldfast to cure in the customary manner. For a period of almost ten (10) years, Eldfast worked exceptionally well when allowed to cure for the customary period (variable two to five days). Because UL intended for Eldfast to fail, UL refused to allow Eldfast to cure to manufacturers [sic] instructions. UL knew that Eldfast could not pass UL-1777 if the test chimney was not properly constructed and cured and if Eldfast did not have time to cure. UL set out to ensure that Eldfast never made it to the North American market.

**Response:**

UL denies the allegations of Paragraph 112.

112.    Plaintiffs refused to pay for the botched "tests". In January 2002, Sanders emailed Plaintiffs in Virginia and threatened to "place a bad debt" on Plaintiffs [sic] account if Plaintiffs did not pay.

**Response:**

UL denies the allegations of Paragraph 112.

113.    In February 2002, Sanders emailed Kikson and requested a listing of "every ingredient along with the the [sic] ratio or proportion (grams, parts, etc.) of each ingredient used with the Eldfast 1 and 3 materials." Sanders represented that "[w]e will need this information for the sieve analysis and the infrared analysis." Sanders also suggested that the Plaintiffs give the full recipe of the powder component of Eldfast to the manufacturer of the fluid component, and the full composition of the fluid to the manufacturer of the powder. Sanders knew that if this happened, Kikson's attempt to maintain the secrecy of the Eldfast product by having it produced by two separate plants would be compromised. Despite notifying UL and objecting to its efforts to comprise [sic] the secrecy of Eldfast, Sanders kept pressing for the recipe.

**Response:**

UL admits it requested the composition of the Eldfast materials together with the ratio or proportion for the purposes of sieve and infrared analysis. UL otherwise denies the allegations of Paragraph 113.

114. Plaintiffs never understood why UL needed the recipe for Eldfast, especially in February 2002, after over a year of alleged "testing".

**Response:**

UL lacks information sufficient to admit or deny the allegations of Paragraph 114.

115. On February 14, 2002, UL notified Kikson that in order to obtain any classification from UL, Plaintiffs would be required to mark each bag and container of Eldfast material as follows: "THIS CHIMNEY REPAIR MATERIAL IS NOT INTENDED FOR USE ON RUBBLE STONE MASONRY CHIMNEYS, CLAY TILE LINERS OR METALLIC CHIMNEY LINERS".

**Response:**

UL admits the allegations of Paragraph 115.

116. Kikson immediately contacted Kuscsik and complained. In a lengthy letter, in which Kikson pointed out, *inter alia*, that Eldfast had been successfully applied to clay liners throughout the United Kingdom, Kikson reiterated that "[o]f all the clay liners that they [the Eldfast general agent in England] have repaired in five years time, not one has cracked! They are all fine!. [sic]" Kikson demanded a meeting to "get this straightened out". Kuscsik advised Kikson that UL needed even more information for "testing of Eldfast on clay flue tile".

**Response:**

UL admits Plaintiffs sent UL a letter, the contents of which speak for itself. UL otherwise denies the allegations of Paragraph 116.

117. On March 20, 2002, without any notice to Plaintiffs, UL published something it called a UL "Classification", indicating that Eldfast was found to be in compliance with the applicable requirements for a "Chimney Repair/Resurfacing system for use on brick/mortar chimneys". This is not a UL-1777 listing. This is something new called a "Classification".

**Response:**

UL admits it found Eldfast to be in compliance with the applicable requirements for the Chimney Repair/Resurfacing system for use in brick/mortar chimneys and eligible for UL

classification. UL also admits Eldfast was not found eligible for Listing under UL 1777. UL

otherwise denies the allegations of Paragraph 117.

118. Until this case, there was no such thing as a UL "Classification" for a product. "Classification" only means that, according to UL, the "world leader" in product-safety testing, Eldfast is in a "Classification" of its own.

**Response:**

UL denies the allegations of Paragraph 118.

119. UL knows that its "Classification" has doomed Eldfast. The intended and actual effect of the "Classification" was to falsely represent to the industry that Eldfast failed UL-1777.

**Response:**

UL denies the allegations of Paragraph 119.

120. On March 29, 2002, Kuscsik emailed Plaintiffs in Virginia in response to a posting on the Chimney L web group. The posting was from a potential dealer of Eldfast in the United States. The potential dealer wrote:

> The Eldfast product is more expensive than Ahrens but it is listed with UL now, to UL 1777 standard which means it can be used to line a chimney. Seems like if you could get fast at this you could make a heap of money. Right now we reline with stainless steel when needed.

Kuscsik stated to Kikson that "[t]he product is NOT Listed to UL 1777. It was evaluated for Classification (instead of Listing), and not to UL 1777 but to an Outlined [sic] of Investigation (temporarily labeled UL 1777 A...)". Kuscsik further stated that "[t]his product is NOT Classified by UL for use as a stand-alone liner. It was evaluated for use as a resurfacing or repair system only".

**Response:**

UL admits that on March 28, 2002 Kuscsik e-mailed Landy Vent USA and WI. Jean

stating that "[t]he product is NOT Listed to UL 1777. It was evaluated for Classification (instead

of Listing), and not to UL 1777 but to an Outlined [sic] of Investigation (temporarily labeled UL

1777 A...), and "[t]his product is NOT Classified by UL for use as a stand-alone liner. It was

evaluated for use as a resurfacing or repair system only". UL otherwise denies the allegations of

Paragraph 120.

121.    In accordance with UL's instructions, Plaintiffs were forced to publish Kuscsik's comments to the chimney industry.

**Response:**

UL denies the allegations of Paragraph 121.

122.    Kuscsik made no mention of the fact that Eldfast passed all of UL's tests. Kuscsik and UL deliberately distorted the truth to destroy Plaintiffs' business expectancies with all potential dealers and customers.

**Response:**

UL denies the allegations of Paragraph 122.

### UL's Bad Faith And Violation of Confidentiality

123.    In April, 2002, Kikson and Stewart spoke with a competitor who is currently developing a new chimney product that he is going to have tested in the near future.

**Response:**

UL lacks information sufficient to admit or deny the allegations of Paragraph 123.

124.    The competitor revealed that he had had at least one recent two (2) hour telephone conversation with UL about the Eldfast testing. During this conversation, UL disclosed to the competitor, *inter alia,* that Eldfast had failed the test on clay flue tiles. UL never informed the competitor about *why* the test failed or how UL had intentionally botched the prior UL-1777 testings or that Eldfast had actually passed all UL tests on the brick and mortar chimney.

**Response:**

UL lacks information sufficient to admit or deny the statements of the unidentified

"competitor." UL otherwise denies the allegations of Paragraph 124.

125.    The information between UL and Plaintiffs is confidential.

**Response:**

UL denies the allegations of Paragraph 125.

126.    UL breached its agreement of confidentiality, flagrantly misappropriated and violated all confidentiality and trade secret laws, and defamed Plaintiffs in their trade and business.

**Response:**

UL denies the allegations of Paragraph 126.

127.    Upon information and belief, UL also gave the competitor and/or discussed proprietary information concerning the components and make-up of Eldfast. UL had no right to disclose any proprietary information to anyone. Why else did Sanders ask for the proprietary information after the fact?

**Response:**

UL denies the allegations of Paragraph 127.

128.    The competitor also informed Kikson and Stewart that for a period of at least two (2) years he had been talking with Zimmerman about the fact that clay flue tile liners cannot take temperatures higher than 1800°F, and, therefore, trying to test any material on clay file liners is destined to fail because UL-1777 is carried out at 2100°F. The competitor also revealed that UL knew that clay flue tiles cannot withstand a quicker increase in temperature than 120°F per hour, or the tiles will crack. If UL knew this in the beginning, why during the Eldfast test did UL increase the temperature from ambient to 1000°F in just fifteen (15) minutes??? Why did UL set up Kikson and Stewart and Eldfast to do a test at 2100°F, knowing that clay flue tiles cannot take more than 1800°F???

**Response:**

UL lacks information sufficient to admit or deny the allegations of Paragraph 128

regarding any statement by the unidentified "competitor." UL otherwise denies the allegations

of Paragraph 128.

129.    In April 2002, Plaintiffs advised UL that they categorically refused to have anything further to do with Sanders.

**Response:**

UL lacks information sufficient to admit or deny the allegations of Paragraph 128.

130.    After exhausting Kikson and Stewart's resources, delaying the proper testing of Eldfast for over two (2) years, and now, through the issuance of a "Classification", destroying Kikson and Stewart's chances of distributing Eldfast in North America, UL now suggests that it is willing to test Eldfast in accordance with the current requirements of UL-1777. Of course, UL demands more money for the testing.

**Response:**

UL denies the allegations of Paragraph 130.

131.    UL has irreparably damaged the Plaintiffs' reputation and eliminated any chance of bringing Eldfast to North America. Plaintiffs have no further resources and no inclination for any further UL "testing".

**Response:**

UL denies the allegations of Paragraph 131.

## COUNT I - COMMON-LAW FRAUD

132.    Plaintiffs restate paragraphs 1 through 131 of their Motion for Judgment, and incorporate them herein by reference.

**Response:**

UL adopts and re-alleges it answers to Paragraphs 1 through 131 as and for its answer to

Paragraph 132.

133.    UL misrepresented that it intended to test Eldfast to the UL-1777 standard. UL had no intention of ever properly testing or listing Eldfast to UL-1777. UL knowingly and repeatedly constructed defective test chimneys, misrepresented that the chimneys were properly cured and that the tests were ready to be conducted. UL manufactured test parameters (ambient temperature), all of which made it impossible for Eldfast to pass and obtain a listing. UL misled Plaintiffs for almost two years concerning the need for further and additional testing. Further tests were not necessary. UL made up fictional "hollow sounds" and other excuses for not passing Eldfast. When UL ran out of excuses and in a blatant effort to hide its wrongdoing, UL lied to Plaintiffs about testing the Eldfast product on clay flue tile liners. UL concealed from Plaintiffs its specific knowledge concerning clay flue tile liners and rigged its own tests.

**Response:**

UL denies the allegations of Paragraph 133.

134.    UL's representations and omissions were false and misleading at the time they were made. UL knew that Eldfast would pass UL-1777, just as it had passed all product-safety testing in Europe. UL knew that Eldfast was very successful in Europe and that it would be eminently successful in North America. UL interfered, obstructed and delayed the testing of Eldfast and misrepresented test results to competitors in an effort to destroy Plaintiffs' efforts to bring Eldfast to North America. UL also knew that Eldfast could not be tested on clay flue tile liners. UL deliberately, consciously and recklessly omitted to disclose material information concerning the clay flue tile liners to Plaintiffs. The "clay flue tile liner" idea was nothing more than a way to obfuscate UL's misrepresentations and fraud in connection with the UL-1777 testing.

**Response:**

UL denies the allegations in Paragraph 134.

135.    UL's misrepresentations proximately caused Plaintiffs' massive losses.  In direct reliance upon UL's representations, Plaintiffs expended hundreds of thousands of dollars of cost and out-of-pocket expense pursuing the illusion that UL was acting in good faith and was "testing" the Eldfast product.  In reliance upon UL, Plaintiffs advised the chimney industry that Eldfast was being tested...and tested...and tested.  Through misrepresentations, omissions and fraudulent conduct, UL delayed the process and concealed the truth about the real "testing", which caused all potential customers and dealers to abandon the Plaintiffs.  As a direct result of UL's fraudulent conduct, potential customers and dealers lost all faith in Plaintiffs and Eldfast. Plaintiffs have now lost the opportunity to bring Eldfast to North America.  Even though Eldfast passed all of UL's tests (a fact which UL has concealed from the industry), no one will purchase Eldfast.    The lost profits from the sale of Eldfast in North America are more than $50,000,000.00.

**Response:**

UL denies the allegations of Paragraph 135.

136.    UL's misrepresentations and omissions were done knowingly, recklessly and with the intent to mislead. UL knowingly and repeatedly disregarded its own specifications and standards, and advised its contractor to disregard the same as well. UL knowingly sabotaged the Plaintiffs' "testing" by, *inter alia*, intentionally removing the sign marked "DO NOT REMOVE HEATER" and starting tests when UL knew that **both** the test chimney and the Eldfast had not cured. UL knowingly allowed ambient temperature in the test area to fluctuate in such as well as to skew the test results. UL then used the skewed test results to fail Eldfast.

**Response:**

UL denies the allegations of Paragraph 136.

137.    UL knew that it was constructing defective test chimneys and did so as part of a scheme to sabotage Eldfast. UL acted with reckless disregard for the rights and interests of the Plaintiffs.

**Response:**

UL denies the allegations of Paragraph 137.

138.    Plaintiffs believed UL's representations and omissions, relied and acted upon the representations and omissions and conduct of UL.

**Response:**

UL lacks information sufficient to admit or deny the allegations of Paragraph 138.

139.    UL's actions and omissions constitute common-law fraud, both actual and constructive. UL made numerous false misrepresentations of material facts, knowingly and intentionally, with the intent to mislead. Plaintiffs relied upon these misrepresentations and omissions and, as a result, suffered loss. UL represented as true what was really false in such a

way as to induce Plaintiffs to believe it, and with the intent that the Plaintiffs would act upon the misrepresentations and omissions.

**Response:**

UL denies the allegations of Paragraph 139.

140.    As a direct result of UL's fraud, misconduct, actions and inaction, Plaintiffs have suffered damage and incurred loss, including, but not limited to, loss of business and business opportunities, lost profits, loss of good will and damage to their names and reputation, costs and expense incurred in connection with the sham "testing" of Eldfast, attorney's fees and other out-of-pocket expenses.

**Response:**

UL denies the allegations of Paragraph 140.

## COUNT II - CONSPIRACY

141.    Plaintiffs restate paragraphs 1 through 140 of their Motion for Judgment, and incorporate them herein by reference.

**Response:**

UL adopts and re-alleges it answers to Paragraphs 1 through 140 as and for its answer to

Paragraph 141.

142.    UL combined, associated, agreed or acted in concert both with competitors of Plaintiffs, contractors hired to construct test chimneys, and other third parties, for the purpose of willfully and maliciously defrauding Plaintiffs and injuring Plaintiffs in their trade, business, and reputation.

**Response:**

UL denies the allegations of Paragraph 142.

143.    Through fraud, deceit and obfuscation, UL intentionally sabotaged the testing of Eldfast in order to prevent Plaintiffs from entering the North America market.  UL deliberately leaked confidential and proprietary information concerning Eldfast to competitors in a further effort to damage the Plaintiffs.  UL knew that this information would spread like wildfire through the chimney industry and that Plaintiffs' product and reputation would be destroyed.

**Response:**

UL denies the allegations of Paragraph 143.

144.    UL acted intentionally, purposefully and without lawful justification.

**Response:**

UL denies the allegations of Paragraph 144.

145.    UL's actions constitute a statutory conspiracy under § 18.2-499 of the Virginia Code and at common-law.

**Response:**

UL denies the allegations of Paragraph 145.

146.    As a direct result of UL's misconduct, actions and inaction, the Plaintiffs have suffered damage and incurred loss, including, but not limited to, loss of business and business opportunities, lost profits, loss of good will and damage to their names and reputation, costs and expense incurred in connection with the sham "testing" of Eldfast, attorney's fees and other out-of-pocket expenses.

**Response:**

UL denies the allegations of Paragraph 146.

## COUNT III -VIOLATION OF CONFIDENTIALITY

147.    Plaintiffs restate paragraphs 1 through 146 of their Motion for Judgment, and incorporate them herein by reference.

**Response:**

UL adopts and re-alleges its answers to Paragraphs 1 through 146 as and for its answer to

Paragraph 147.

148.    By UL's own terms, conditions, and standards, all information relating to the testing of Eldfast was intended and agreed to be kept strictly confidential.

**Response:**

UL denies the allegations of Paragraph 148.

149.    Information relating to the testing is also trade secret within the meaning of the Uniform Trade Secrets Act.

**Response:**

UL denies the allegations of Paragraph 149.

150.    UL knew that all information relating to the testing of Eldfast was required to be kept strictly confidential.

**Response:**

UL denies the allegations of Paragraph 150.

151.    Plaintiffs never consented in any way to the disclosure of any information relating to the testing of Eldfast to any person.

**Response:**

UL lacks information sufficient to admit or deny the allegations of Paragraph 151.

152.    Information relating to the testing of products by UL derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons (like competitors of the Plaintiffs) who can obtain economic value and advantage from its disclosure or use.

**Response:**

UL lacks information sufficient to admit or deny allegations of Paragraph 152.

153.    Information relating to the testing of products by UL is subject to efforts by UL to maintain its secrecy.

**Response:**

UL denies the allegations of Paragraph 153.

154.    UL breached its agreement to keep all testing information confidential and misappropriated the Eldfast testing information, when it revealed to Plaintiffs' competitors the results of the clay flue tile test and, upon information and belief, other results of the UL-1777 testing. Upon information and belief, Zimmerman and Sanders have had numerous conversations with Plaintiffs' competitors about Eldfast and the testing. Plaintiffs' competitors know information that they could only have obtained from UL.

**Response:**

UL denies the allegations of Paragraph 154.

155.    UL's disclosure of this confidential information was willful and malicious. UL knew that the information would become public knowledge and intended to sabotage the Plaintiffs' efforts to bring Eldfast to North America.

**Response:**

UL denies the allegations of Paragraph 155.

156.    As a direct result of UL's breach of its duty to maintain confidentiality and violation of the Uniform Trade Secrets Act, the Plaintiffs have suffered damage and incurred

loss, including, but not limited to, loss of business and business opportunities, lost profits, loss of good will and damage to their names and reputation, costs and expense incurred in connection with the sham "testing" of Eldfast, attorney's fees and other out-of-pocket expenses.

**Response:**

UL denies the allegations of Paragraph 156.

## COUNT IV - TORTIOUS INTERFERENCE WITH BUSINESS

157.    Plaintiffs restate paragraphs 1 through 156 of their Motion for Judgment, and incorporate them herein by reference.

**Response:**

UL adopts and re-alleges its answers to Paragraphs 1 through 156 as and for its answer to

paragraph 157.

158.    At the time Plaintiffs first approached UL about testing Eldfast, and for a time thereafter, Plaintiffs had a real expectancy of obtaining contracts, distributorships and other business relationships with numerous dealers and customers in the United States and Canada.

**Response:**

UL lacks information sufficient to admit or deny the allegation of paragraph 158.

159.    UL knew of Plaintiffs' substantial business expectancies. UL participated in industry discussion groups and was otherwise informed of Plaintiffs' legitimate expectancies. Plaintiffs had hundreds of potential customers and distributors.

**Response:**

UL denies the allegations of Paragraph 159.

160.    UL intentionally interfered with the Plaintiffs' business expectancies.

**Response:**

UL denies the allegations of Paragraph 160.

161.    UL used improper means and methods to interfere with Plaintiffs, such as fraud, sabotaging the tests, unfair competition, defamation of Plaintiffs and Eldfast, disclosure of confidential information to competitors, and completely unethical conduct.

**Response:**

UL denies the allegations of Paragraph 161.

162.    As a direct result of UL's tortious interference with contract, the Plaintiffs have suffered damage and incurred loss, including, but not limited to, loss of business and business opportunities, lost profits, loss of good will and damage to their names and reputation, costs and expense incurred in connection with the sham "testing" of Eldfast, attorney's fees and other out-of-pocket expenses.

**Response:**

UL denies the allegations of Paragraph 162.

## COUNT V - NEGLIGENCE

163.    Plaintiffs restate paragraphs 1 through 162 of their Motion for Judgment, and incorporate them herein by reference.

**Response:**

UL adopts and re-alleges it answers to Paragraph 1 through 156 as and for its answer to

Paragraph 157.

164.    UL agreed and undertook to test Eldfast to UL-1777.

**Response:**

UL denies the allegations of Paragraph 164.

165.    UL owed Plaintiffs a duty to act as reasonably prudent engineers and test technicians under the same or similar circumstances and to test Eldfast in accordance with UL's standards and specifications and in accordance with standards and customs in the chimney industry, and in such a way so as not to injure the Plaintiffs.

**Response:**

UL denies the allegations in Paragraph 165.

166.    UL disregarded its own specifications, standards, and testing procedures. UL ignored standards and customs in the industry for the construction of test chimneys. UL negligently began the tests without allowing the test chimney's [sic] to cure and then, *inter alia*, allowed the ambient temperature in the test area to be corrupted. UL repeatedly sabotaged the tests and leaked confidential information to Plaintiffs' competitors.

**Response:**

UL denies the allegations in Paragraph 166.

167.    UL breached its duties to the Plaintiffs and was negligent in the performance of its duties and contract. UL's conduct constitutes negligence.

**Response:**

UL denies the allegations in Paragraph 167.

168.    As a direct result of UL's negligence, the Plaintiffs have suffered damage and incurred loss, including, but not limited to, loss of business and business opportunities, lost profits, loss of good will and damage to their names and reputation, costs and expense incurred in connection with the sham "testing" of Eldfast, attorney's fees and other out-of-pocket expenses.

**Response:**

UL denies the allegations of Paragraph 168.

## COUNT VI-DEFAMATION

169.    Plaintiffs restate paragraphs 1 through 168 of their Motion for Judgment, and incorporate them herein by reference.

**Response:**

UL adopts and re-alleges its answers to Paragraphs 1 through 168 as and for its answer to

Paragraph 169.

170.    UL published numerous untruthful and slanderous comments about Plaintiffs and their product, Eldfast, to competitors of Plaintiffs. UL advised competitors that Eldfast "failed" the clay flue tile liner test. Plaintiffs did not fail any "clay flue tile" test. The clay flue tile test was rigged from the start and doomed to failure because of the physical propensities of clay flue tiles (which was concealed from Plaintiffs but revealed by Zimmerman to Plaintiffs' competitors).

**Response:**

UL denies the allegations of Paragraph 170.

171.    Upon information and belief, UL also advised Plaintiffs' competitors that Eldfast could not be tested under UL-1777 and had failed the UL-1777 tests.

**Response:**

UL denies the allegations of Paragraph 171.

172.    UL concealed the fact that Eldfast had passed all the UL tests. UL grossly distorted the truth about the testing in such a way that a reasonable person would (and competitors did) believe that Eldfast failed the tests, should not be listed, and is an unsafe product.

**Response:**

UL denies the allegations of Paragraph 172.

173. UL's "Classification" report and letter also constitutes defamation. UL has represented *de facto* that Eldfast failed the UL-1777 testing and is not fit for a UL listing. UL has made it appear to competitors, dealers and customers of Plaintiffs that Eldfast is not safe for use in North America. UL's representations are false.

**Response:**

UL denies the allegations of Paragraph 173.

174. UL's words constitute defamation *per se*. They have severely prejudiced the Plaintiffs in their profession and in the eyes of the chimney industry.

**Response:**

UL denies the allegations of Paragraph 174.

175. As a direct result of UL's defamation of Plaintiffs, the Plaintiffs have suffered damage and incurred loss, including, but not limited to, loss of business and business opportunities, lost profits, loss of good will and damage to their names and reputation, special damages, including the costs and expense incurred in connection with the sham "testing" of Eldfast, attorney's fees and other out-of-pocket expenses.

**Response:**

UL denies the allegations of Paragraph 175.

WHEREFORE, UL prays that the Court:

a. Dismiss the Motion For Judgment with prejudice

b. Enter judgment for UL and against plaintiffs;

c. Award UL its costs of suit; and

d. Award such further relief as this Court finds to be in the interest of justice.

## GENERAL AND AFFIRMATIVE DEFENSES

For its general and affirmative defenses to the Motion For Judgment, UL states as follows:

1. The Motion For Judgment fails to state a claim upon which relief may be granted.

2.     Plaintiffs' alleged damages are purely economic in nature and are not recoverable against UL.

3.     UL neither assumed nor owed any duty to plaintiffs.

4.     Plaintiffs failed to mitigate their alleged claims and/or damages.

5.     Plaintiffs have failed to join necessary and/or indispensable parties.

6.     Plaintiffs' alleged damages were caused solely by their own acts and omissions and not by any purported act or omission by UL.

7.     Plaintiff's negligence proximately caused their alleged damages.

8.     UL reserves the right to assert other affirmative defenses that may become known or relevant upon additional discovery and investigation.

WHEREFORE, UL requests the Court to dismiss the Motion for Judgment with prejudice, enter judgment in UL's favor, and award UL its costs.

Dated this 3rd day of November, 2003.

Respectfully submitted,

UNDERWRITERS LABORATORIES INC.

One of its Attorneys

Michael J. Abernathy
Patricia Kane Schmidt
Christopher I. Cedillo
Wendy J. Weimer
BELL, BOYD & LLOYD, LLC
70 West Madison Street, Suite 3300
Chicago, Illinois 60602
(312) 372-1121

<u>Of Counsel</u>:
Geoffrey A. Lewis
Charles A. Rego
Underwriters Laboratories Inc.
333 Pfingsten Road
Northbrook, Illinois 60062

## CERTIFICATE OF SERVICE

I hereby certify that (1) I am an attorney admitted to appear before this Court and (2) I caused a true and correct copy of the foregoing **Underwriters Laboratories Inc.'s Answer and Affirmative Defenses** to be served on the following individuals:

> Steven S. Biss
> P.O. Box 592
> Richmond, Virginia 23219
>
> and
>
> James K. Toohey
> Peter A. Milianti
> McGuireWoods Ross & Hardies
> 150 N. Michigan Ave.
> Suite 2500
> Chicago, IL 60601
>
> via first class mail;

and courtesy copy by e-mail this 3rd day of November 2003.

_____
One of the Attorneys for
UNDERWRITERS LABORATORIES INC.