IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| F:A J. KIKSON, a Swedish corporation, )<br>JEAN KIKSON, a foreign citizen, and )<br>KEVIN STEWART, an individual )<br>residing in Virginia, )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>UNDERWRITERS LABORATORIES, )<br>a not-for-profit corporation, )<br>)<br>Defendant. ) | Judge Ronald A. Guzmán<br><br>02 C 8265 |

## MEMORANDUM OPINION AND ORDER

In this diversity case, Plaintiffs F:A J. Kikson, Jean Kikson and Kevin Stewart have sued Underwriters Laboratories ("UL") for negligence, fraud, conspiracy to defraud, breach of confidentiality,[1] tortious interference with prospective economic advantage and defamation. UL has moved for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56 arguing that Stewart lacks standing to sue UL and, in the alternative, that Plaintiffs have failed to raise a genuine issue as to a material fact regarding each of their claims. UL has also moved to strike certain paragraphs of Jean Kikson's affidavits. For the reasons provided in this Memorandum Opinion and Order, the Court: (1) grants in part and denies in part the motion to strike; (2) grants the summary judgment motion as to Stewart's lack of standing; (3) grants the summary judgment motion as to the conspiracy claim; and (4) denies the summary judgment motion as to the negligence, fraud, tortious interference with prospective economic advantage and defamation claims.

---

[1] In response to UL's summary judgment motion, Plaintiffs voluntarily withdrew their claim for breach of confidentiality. (Pl.'s LR 56.1(b)(3)(A) ¶¶ 135-44.)

## FACTS

UL is a corporation engaged in the investigation and testing of products concerning hazards affecting life and property. (Def.'s LR 56.1(a)(3) ¶ 1.) UL owns a number of federally registered certification marks, including the "UL within a circle" and "Underwriters Laboratories, Inc." marks (collectively "UL Mark"). (*Id.* ¶ 3.) UL publishes the names of manufacturers authorized to use the UL Mark on products complying with UL's certification requirements, to whom UL refers as "listees." (*Id.* ¶ 4.) The identity of listees are publicly available in UL's published directories and on UL's on-line certification directory. (*Id.*)

Kikson invented Eldfast, a non-metallic, ceramic-based chimney liner and repair compound. (*Id.* ¶ 13; Pl.'s LR 56.1(b)(3)(B) ¶ 13.) Kikson owns F:A J. Kikson, a Swedish corporation. (Def.'s LR 56.1(a)(3) ¶ 14.) Kevin Stewart was formerly a director and president of Landy Vent USA, a now-dissolved Virginia corporation that held the exclusive rights to market Eldfast in the United States. (*Id.* ¶ 15; Def.'s Ex., Stewart Dep. at 40-41.) Stewart, in his dealings with UL during the testing process, was acting on behalf of Landy Vent USA. (Def.'s LR 56.1(a)(3) ¶¶ 116-20, 122-23.) Plaintiffs sought a UL listing in the United States because Eldfast is a unique ceramic coating that functions as a chimney liner and repair compound. (Pl.'s LR 56.1(b)(3)(B) ¶ 13.)

On August 22, 2000, Landy Vent AB, a Swedish corporation that acted as an agent for Kikson and F:A J. Kikson, entered into a contract[2] with UL for the investigation of Eldfast as a chimney liner under UL's standard certification requirements for chimney liners, UL 1777, which

---

[2]The contract stated that UL had "no obligation or liability for damages, including but not limited to consequential damages, arising out of or in connection with the use of, inability to use, or delay in receipt of the information resulting from this investigation." (*Id.* ¶ 22.) So, it is unsurprising that Plaintiffs do not sue in contract.

2

tests, among other things, heat conductivity. (Def.'s LR 56.1(a)(3) ¶¶ 10-12, 16-17.) Section 3.5 of UL 1777 expressly defines a test masonry chimney as a "field constructed chimney of solid masonry units, bricks . . . built in accordance with applicable building code requirements." (Pls.' LR 56.1(b)(3)(B) ¶ 8.) UL 1777 states in pertinent part that: (1) the test chimney is to be constructed of "solid clay brick"; (2) the mortar joints are to be 3/8 inch thick with a tolerance of +/− 1/8 inch; (3) the test chimney enclosure material is to be placed around the chimney "on the basis of clearance from the enclosure of 0 or 1 inch" as specified by the manufacturer's installation instructions; (4) test chimneys are to be fifteen feet in height; and (5) the test room is to be free of extraneous drafts. (*Id.* ¶¶ 8-11.)

Landy Vent UK, acting as agent for Kikson and his business entities, arranged for the Eldfast product to be tested by UL and Building Services Research and Information Association ("BSRIA") at a testing facility in London, England. (*Id.* ¶ 18.) It is disputed whether the testing done at the BSRIA testing facility on October 23 and 24, 2000 complied with UL 1777. (Pls.' LR 56.1(b)(3)(A) ¶¶ 30-36.)

Thereafter, UL ran tests of Eldfast in February and March 2001. (Def.'s LR 56.1(a)(3) ¶¶ 40, 54.) It is disputed whether these tests complied with UL 1777 due to the size of the mortar joints in the test chimney, the curing time of the Eldfast product, the test chimney size, and extraneous drafts in the testing room. (*Id.* ¶¶ 43, 46, 55-57; Pls.' LR 56.1(b)(3)(B) ¶¶ 40, 42-50, 52, 54-57.) As discussed below, it is disputed as to whether Raymond Sanders, the UL engineer responsible for one of the tests, was aware of the inappropriate mortar joint size prior to testing and whether UL engineers were aware of the inappropriate chimney size prior to testing.

At some point prior to August 25, 2001, UL's lead engineering associate, Robert Zimmerman, spoke with one of Plaintiffs' competitors, Ken Simons, on the phone for five

3

minutes. (Pls.' Ex. 11, Zimmerman Dep. at 121-25.) During that conversation, Simons asked Zimmerman whether Eldfast was listed by UL, and Zimmerman said "no." (*Id.* at 121-22.) On August 25, 2001, UL's engineering group leader, Stephen Kuscsik, posted an entry on a chimney sweep bulletin board/discussion group website in which he denied that UL had ever provided information regarding a current investigation of Eldfast to Ken Simons. (Pls.' Ex. 14, Email from Kuscsik to Simons of 8/25/01.)

UL ran tests of the Eldfast product in August and November 2001 and applied a standard that was in development at the time, UL 1777A, and the extent to which UL 1777A incorporated aspects of UL 1777 is disputed. (Pls.' LR 56.1(b)(3)(A) ¶¶ 69-70, 75-76, 80.) It is also disputed whether this testing complied with UL 1777 or UL 1777A due to the test chimney size, curing time for the Eldfast product, excessive heat application and the flue size in the clay-tile-lined test chimney. (*Id.* ¶¶ 70-71, 80, 85, 88, 92.)

UL states, and Plaintiffs dispute, that Eldfast did not meet the UL 1777 or the UL 1777A standard in full. (Def.'s LR 56.1(a)(3) ¶¶ 55-57, 97.) Accordingly, in March 2002, UL notified Kikson and Landy Vent USA that Eldfast was eligible for a UL Classification for use as a chimney repair product for brick and mortar chimneys. (*Id.* ¶ 98.) A UL Classification differs from a UL Listing in that UL-listed products have been tested and found to be free from reasonably foreseeable risk of fire, electric shock and related hazards. (*Id.* ¶ 99.) UL-classified products have been tested for specific properties, a limited range of hazards, or suitability for use under limited or special conditions. (*Id.*) Each bag of the Eldfast product would be required to state that Eldfast "was not intended for use on rubble stone, masonry chimneys, clay tile liners or metallic chimney liners." (Pls.' LR 56.1(b)(3)(B) ¶ 88.)

As a result of the events that occurred during their dealings with UL, a relationship which

4

stretched over one and a half years, Plaintiffs state that they have lost customers and dealers who once were eager to sell the Eldfast product, profits, good will and reputation, and out-of-pocket expenses related to the "sham" testing. (Pls.' LR 56.1(b)(3)(B) ¶¶ 95-96.)

## DISCUSSION

Rule 56(c) allows the Court to grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that here is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In considering the evidence submitted by the parties, we do not weigh it or determine the truth of asserted matters. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). We "must view the facts, and all reasonable inferences drawn therefrom, in a light most favorable to the nonmoving party." *Baron v. City of Highland Park*, 195 F.3d 333, 337 (7th Cir. 1999). If a reasonable jury could not find for the party opposing the motion, it must be granted. *Seshadri v. Kasraian*, 130 F.3d 798, 804 (7th Cir. 1997).

I.  **Motion to Strike Certain Paragraphs of Jean Kikson's Affidavit**

UL has moved to strike several paragraphs of Kikson's affidavits. Kikson's first affidavit is UL's own exhibit and Kikson's second affidavit is Plaintiffs' exhibit. (Def.'s Ex. 51, Kikson Aff.; Pls.' Ex. 1, Kikson Second Aff.) UL argues that both affidavits contain inadmissible hearsay and legal conclusions.

Rule 56(e) provides: "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." FED. R. CIV. P.

56(e). A court may *sua sponte* strike an affidavit or portions thereof for failing to comply with Rule 56(e). *Simmons v. Contel/GTE Corp.*, No. 93 C 20019, 1995 WL 30612, at *3 (N.D. Ill. Jan. 25, 1995).

The Court grants in part and denies in part the motion to strike paragraphs of Kikson's first affidavit. To the extent that Kikson reports statements of others, opines about what UL knew (which is outside the realm of his personal knowledge) or provides legal conclusions, the motion to strike is granted. For example, (1) Kikson's statements regarding what UL's Stephen Kuscsik told Eric Bramfitt of Landy Vent USA is inadmissible hearsay, (Def.'s Ex. 51, Kikson Aff. ¶ 37); (2) his statement as to what UL knew is outside of his personal knowledge and based on speculation, (*id.* ¶ 27); and (3) his statement that UL's representations constitute defamation per se is a legal conclusion, (*id.* ¶ 76, sentence 4).

However, to the extent that he provides information that is based on personal knowledge or belief, including but not limited to the extent of Plaintiffs' losses, the motion to strike portions of Kikson's first affidavit is denied. For example, Kikson is qualified to testify that customers and dealers, who were eager to purchase the Eldfast product from Kikson and Stewart, are no longer interested after UL purportedly botched the testing, (*id.* ¶ 73), that he believes that UL omitted any admission of the botched testing (*id.* ¶ 75), and inaccurately reported that the Eldfast product failed the testing, (*id.* ¶¶ 65, 76, sentence 1). Further, he is qualified to testify regarding the losses that he and F:A J. Kikson suffered. (*See id.* ¶¶ 72-74, 77.)

The Court denies the motion to strike as to Jean Kikson's second affidavit in which he states the losses incurred by himself and F:A J. Kikson. Kikson, as inventor of the Eldfast product and owner of F:A J. Kikson, is clearly qualified to testify as to these losses. (*See* Pls.' Ex. 1, Kikson Second Aff.) At trial, UL is free to question Kikson as to the accuracy of his

calculations and projections regarding lost income and profit. Such questions, however, attack the weight of the evidence and not its admissibility.

## II. Motion for Summary Judgment

In support of its motion for summary judgment, UL argues that: (1) Kevin Stewart lacks standing to sue UL on behalf of Landy Vent USA; (2) Plaintiffs' negligence claims are barred by *Moorman Manufacturing Co. v. National Tank Co.*, 435 N.E.2d 443, 453 (Ill. 1982), and its progeny; and (3) Plaintiffs have failed to create a genuine issue as to a material fact regarding their fraud, conspiracy, tortious interference with prospective economic damage or defamation claims. Of course, Plaintiffs disagree.

### A. Standing

"Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." FED. R. CIV. P. 12(h)(3). Thus, "the absence of jurisdiction may be raised at any time in the course of a proceeding, and it is the duty of a federal court always to address its jurisdiction once an issue has been raised." *Gen'l Ry. Signal Co. v. Corcoran*, No. 89 C 9360, 1992 WL 220604, at *3 (N.D. Ill. Sept. 4, 1992); *see United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, (7th Cir. 2003) ("Subject matter jurisdiction . . . must be considered at any stage of the litigation.").

Stewart was the director and president of Landy Vent USA, a now-dissolved Virginia corporation, which owned the exclusive rights to market the Eldfast product in the United States. The undisputed facts in the record clearly show that when Stewart was dealing with UL, he was acting as a representative of Landy Vent USA. (Def.'s LR 56.1(a)(3) ¶¶ 15, 112-20.)

Accordingly, UL argues that Stewart lacks standing to sue on Landy Vent USA's behalf and only Landy Vent USA itself has proper standing.

"The capacity of a corporation to sue or be sued shall be determined by the law under which it was organized." FED. R. CIV. P. 17(b). Under Virginia law, "[t]he rule is that an officer or a shareholder of a corporation, even if he is the sole shareholder, has no personal or individual right of action against third parties for a wrong or injury inflicted by those third parties upon the corporation." *Mullins v. First Nat'l Exchange Bank of Va.*, 275 F. Supp. 712, 721 (W.D. Va. 1967).

Plaintiffs state, without citation to any portion of the record in support, that "Stewart brings this action as a trustee in liquidation of the business and affairs of Landy Vent USA." (Pls.' LR 56.1(b)(3)(A) ¶ 125.) This is insufficient to create an issue of fact with regard to the capacity in which he is suing. Further, Plaintiffs fail to provide the date on which Landy Vent USA was dissolved in either their response to UL's statement of facts or in their own statement of additional facts, which might have been helpful to the determination of whether Stewart was suing as an individual or a trustee of a dissolved corporation as of the date of the filing of the instant lawsuit.

Moreover, the caption of the complaint clearly states that Stewart is suing as "an individual residing in Virginia." (Compl. at 1.) Plaintiffs have never requested leave of Court to amend the caption, and it is far too late in the litigation to do so. All that being said, based on the record before it, the Court grants UL's motion for summary judgment as to Stewart's lack of standing.

8

B.  Negligence[3]

Defendant argues that the *Moorman* doctrine bars Plaintiffs'[4] negligence claim. Under this doctrine, a "plaintiff cannot recover for solely economic loss under the tort theories of strict liability, negligence and innocent misrepresentation." *Moorman Mfg. Co. v. Nat'l Tank Co.*, 435 N.E.2d 443, 453 (Ill. 1982). However, one of the exceptions to the *Moorman* doctrine is that "economic loss is recoverable where . . . one who is in the business of supplying information for the guidance of others in their business transactions makes negligent representations." *Id.* at 452 (citations omitted).[5] To fall within this exception, a plaintiff must demonstrate that: "(1) defendant is in the business of supplying information for the guidance of others in their business dealings; (2) defendant provided information that constitutes a misrepresentation; and (3) defendant supplied the information for guidance in the plaintiff's business dealings." *Tolan & Son, Inc. v. KLLM Architects, Inc.*, 719 N.E.2d 288, 296 (Ill. App. Ct. 1999).

To determine whether the first element is satisfied, "courts must undertake a 'precise, case-specific inquiry.'" *Id.* (quoting *Rankow v. First Chi. Corp.*, 870 F.2d 356, 361 (7th Cir. 1989)). "[O]ne may envision a continuum with pure information providers at one end and pure tangible good providers at the other." *Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*, No. 91 C

---

[3]Both parties assume that Illinois law applies to Plaintiffs' tort claims, and their assumption is reasonable given that the testing of the products primarily occurred in Illinois. *See Indem. Ins. Co. of N. Am. v. Hanjin Shipping Co.*, 348 F.3d 628, 637 (7th Cir. 2003).

[4]In their respective briefs in support of and in opposition to Defendant's Motion for Summary Judgment, the parties treat all Plaintiffs as one entity, and accordingly, the Court does the same.

[5]Although UL argues that Plaintiffs' complaint only alleges negligence and not negligent misrepresentation, the Court holds that the complaint clearly alleges negligent misrepresentation such that UL had notice of the claim. (*See, e.g.,* Compl. ¶¶ 16, 22, 24, 29, 52, 71, 77, 96, 97.)

6103, 1994 WL 687579, at *15 (N.D. Ill. Dec. 7, 1994). "The first category–pure information providers–includes businesses that provide a product that consists solely of information. . . . [and] involves those situations where the value of the services lies in the analytical work." *Tolan*, 719 N.E.2d at 297. "The second category–tangible good providers– includes businesses that supply tangible goods and/or noninformational goods or services. . . . [t]he end result of [which] . . . is some sort of tangible object." *Id.*

In *Duchossois Industries v. Stelloh*, a buyer of paintings sued the company who purported to authenticate them for negligent misrepresentation because the paintings were counterfeits. No. 87 C 4132, 1988 WL 2794, at *7 (N.D. Ill. Jan. 13, 1988). The *Duchossois* court held that as alleged the company fit within the *Moorman* exception because: (1) defendant was in the business of providing information describing works of art and their historical chain of authorship, (2) defendant prepared such information regarding the paintings for the seller which misrepresented the authorship, and (3) defendant supplied the information for guidance in the seller's dealings with potential buyers. *Id.* Similarly, in the instant case, UL fits within the exception because: (1) UL is in the business of investigating and testing products concerning hazards affecting life and property (Def.'s LR 56.1(a)(3) ¶ 1); (2) Plaintiffs have raised genuine issues of fact as to whether the information UL provided to Plaintiffs regarding the investigations and tests of the Eldfast product constituted a misrepresentation (*id.* ¶ 17; Pls.' LR 56.1(b)(3)(B) ¶¶ 8-10, 42-43, 47, 57-59, 66), and (3) facts in the record support the conclusion that UL supplied the information for guidance in Plaintiffs' dealings with potential buyers of the Eldfast product (Def.'s LR 56.1(a)(3) ¶ 5). On the continuum with pure information providers at one end and pure tangible good providers at the other, UL exists on the pure information end because the value of its services clearly lies in its analytical work.

UL limits its argument regarding Plaintiffs' negligent misrepresentation claim solely to the theory that the *Moorman* doctrine bars it. Beyond that, UL did not address the merits of this claim. Nor do we. Thus, the Court denies UL's motion for summary judgment as to Plaintiffs' negligent misrepresentation claim.

As for Plaintiffs' other tort claims, where "the defendant owes a duty in tort to prevent precisely the type of harm, economic or not, that occurred," the *Moorman* doctrine does not act as a bar. *See 2314 Lincoln Park West Condo. Ass'n v. Mann, Gin, Ebel & Frazier, Ltd.*, 555 N.E.2d 346, 352 (Ill. 1990). This logic applies equally to Plaintiff's remaining claims of fraud, tortious interference with prospective economic advantage and defamation. *See, e.g., id.* (collecting cases stating that fraud and tortious interference with prospective economic advantage are not barred). It is to these claims that the Court now turns.

## C.  Common Law Fraud and Conspiracy to Defraud

Under Illinois law, the elements of common law fraud are: "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584, 591 (Ill. App. Ct. 1996). "The determination of whether plaintiff's reliance was justifiable necessitates an examination of all the facts which plaintiff knew, as well as those facts the plaintiff could have learned through the exercise of ordinary prudence." *Weber v. DeKalb Corp., Inc.*, 637 N.E.2d 694, 698 (Ill. App. Ct. 1994) (internal quotations omitted).

It would have been helpful if either party had opted to address each individual element of the common law fraud claim. Instead, the parties apparently thought conclusory arguments were

11

the better strategic route. The Court cautions the parties that such a strategy is rarely effective.

First, Plaintiffs have raised disputed issues of fact regarding whether UL falsely stated that it subjected the Eldfast product to a set of tests judged appropriate for the product, which, in this case, was UL's standard for testing chimney liners ("UL 1777") or for testing chimney repair material ("UL 1777A") (Def.'s LR 56.1(a)(3) ¶ 8; Def.'s Ex. DX1, Application for Investigation ¶ 10; Pls.' LR 56.1(b)(3)(B) ¶ 30.) The record is rife with disputed facts as to whether UL's testing was in accordance with its standards, including whether the test chimney(s): (1) had the proper sized mortar joints (Pls.' LR 56.1(b)(3)(B) ¶ 46); (2) were the appropriate height (*id.* ¶ 78); (3) and featured the proper one-inch clearance to combustibles (*id.* ¶ 41).

Second, there is sufficient circumstantial evidence in the record to create a reasonable inference that UL was aware that the tests did not comply with UL 1777. For instance, Raymond Sanders, the UL engineer responsible for one of the tests, was very familiar with the requirements of UL 1777, saw the test chimney as it was being constructed and viewed it again prior to actual testing. It is reasonable to infer from these facts that Sanders would have noticed mortar joints that were 2 inches thick instead of the 1 inch thickness required by UL 1777. Sanders testified that he only discovered the mortar joint size after the test. Thus, Plaintiffs have created a genuine issue as to a material fact regarding awareness. Further, UL 1777 requires test chimneys to be at least fifteen feet in height, and one of the test chimneys for the Eldfast product was four feet in height. The vast discrepancy between the UL 1777's height requirement, of which UL engineers are aware, and the height of the test chimney used for the Eldfast product is sufficient to raise a triable issue as to UL's awareness. Because UL's awareness is in dispute, the "determination of intent in the common law fraud claim is better left to the trier of fact." *See Chow v. Aegis Mortgage Corp.*, 286 F. Supp. 2d 956, 965 (N.D. Ill. 2003).

Third, Plaintiffs have raised circumstantial evidence as to whether UL intended its statement that the Eldfast product was being appropriately tested to induce Plaintiffs to submit the product to more tests. UL had an economic incentive because it billed Kikson's agent, Landy Vent AB, for the series of tests. (*See* Pl.'s Ex. 34, Invoice of 6/30/01; Pl.'s LR 56.1(b)(3)(B) ¶ 14.) Although Plaintiffs eventually refused to pay for any of the tests conducted in the United States, (*see* Def.'s LR 56.1(a)(3) ¶ 148), this clearly could not have been predicted by UL *a priori*.

Fourth, there is ample evidence in the record to support the notion that Plaintiffs relied on the statement and subjected the Eldfast product to the testing process. The Eldfast product underwent UL testing in February, March, August and November 2001. (*See* Pl.'s LR 56.1(b)(3)(B) ¶¶ 35, 55, 64, 75.)

Fifth, Plaintiffs have raised sufficient issues of fact regarding whether they suffered damages resulting from their reliance on UL's statement that it tested the Eldfast product according to the UL standards. Plaintiffs state, and UL disputes, that the inappropriate testing exhausted Plaintiffs' resources, prevented Kikson's ability to operate F:A J. Kikson and delayed proper testing of the Eldfast product for over two years. (*Id.* ¶ 96.)

In sum, there are sufficient triable issues as to Plaintiffs' fraud claim. Next, the Court addresses Plaintiffs' conspiracy to commit fraud claim.

"Civil conspiracy is an agreement of two or more people to commit an unlawful act, or to inflict a wrong against another, and an overt act that results in damages." *Old Sec. Life Ins. Co. v. Cont'l Ill. Nat'l Bank*, 740 F.2d 1384, 1397 (7th Cir. 1984). "Conspiracy alleging a tort as the underlying wrongful act is actionable, as long as it includes additional defendants or new facts not already pled in the underlying tort." *Real Colors, Inc. v. Patel*, 974 F. Supp. 645, 651 (N.D.

Ill. 1997). *But see Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449, 453 (7th Cir. 1982) (questioning basis for creation of tort of conspiracy to commit a tort and stating "[i]f there is a conspiracy and it fails, there is no injury and hence no tort liability; if it succeeds, the damages are fully recoverable in an action on the underlying tort").

Plaintiffs state that UL conspired to defraud them with Ken Simons and Jay Endre, both of whom apparently were in competition with Plaintiffs. (Def.'s LR 56.1(a)(3) ¶ 126.) The record shows that on a single occasion, UL's lead engineering associate Robert Zimmerman spoke with Ken Simons on the phone for five minutes. (Pls.' Ex. 11, Zimmerman Dep. at 121-25.) During that conversation, Simons asked Zimmerman whether Eldfast was listed by UL, and Zimmerman said "no." (*Id.* at 121-22.) The record also contains an email from Stephen Kuscsik, UL's engineering group leader to Ken Simons and Chimneys-L Online Mail List/Discussion Group (a portion of which is admissible as a statement of a party opponent) that states in pertinent part:

> It has been brought to the attention of Underwriters Laboratories Inc. (UL), that comments have been made on the Chimney-L online mail list/discussion group relative to the status of a current investigation being conducted by UL. The comments have indicated that UL has provided information regarding the results of a current investigation to a third party. This inaccurate information has then been published posted on this mail list/discussion group.
>
> We wish to point out that UL considers information relative to the status of a product investigation to be proprietary only between UL and the product submitter. UL will provide verification of Listing or Classification of a product upon request, but will not, however, provide information regarding the existence of or status of an ongoing evaluation.

(Pls.' Ex. 14, Email from Kuscsik to Simons of 8/25/01.)

Based on their brevity and substantive content, these two communications are insufficient to raise a genuine issue regarding whether UL and Simons agreed to defraud Plaintiffs. Further,

14

Kikson admits that he has nothing but hearsay on which to base his theory that Endre was part of the conspiracy. (Def.'s Ex., Kikson Dep. at 127.) Given this paucity of evidence, no reasonable jury could find in Plaintiffs' favor with regard to their conspiracy claim. To hold otherwise would allow this claim to proceed to trial based on sheer speculation.

D.     **Tortious Interference with Prospective Business Advantage**

Under Illinois law, "[t]he elements of tortious interference with an economic expectancy are: (1) a valid business expectancy; (2) knowledge of the expectancy on the part of the interferer; (3) an intentional and unjustified interference which prevents the realization of the expectancy; and (4) damages." *Dawson v. Gen. Motors Corp.*, 977 F.2d 369, 375 (7th Cir. 1992); *see Fellhauer v. City of Geneva*, 568 N.E.2d 870, 878 (Ill. 1991). Further, it is "well-established that 'the tortious interference allegedly committed by the defendant must be directed toward a third party [with whom plaintiff had a business expectancy]–not the plaintiff.'" *Cavalieri-Conway v. L. Butterman & Assocs.*, 992 F. Supp. 995, 1012 (N.D. Ill. 1998) (quoting *Silk v. City of Chi.*, No. 95 C 143, 1997 WL 790598, at *19-20 (N.D. Ill. Dec. 17, 1997) (listing cases)); *see Cohabaco Cigar Co. v. U.S. Tobacco Co.*, No. 98 C 1580, 1999 WL 988805, at *14 (N.D. Ill. Oct. 22, 1999). Plaintiff must show that defendant interfered with a business expectancy "with specific third parties or with an identifiable prospective class of third persons." *Parkway Bank & Trust Co. v. City of Darien*, 357 N.E.2d 211, 214 (Ill. App. Ct. 1976).

UL argues that summary judgment is proper because UL accurately reported that Eldfast was not UL-listed and because UL eventually issued a UL classification for Eldfast's use as a chimney repair liner in limited environments. However, whether it accurately reported that Eldfast was not UL-listed and whether UL properly limited the classification of Eldfast depends

15

on whether UL tested the Eldfast product to UL standards, an issue which is hotly contested in this case.

UL also argues that there is no evidence in the record to suggest that UL directed its alleged interfering statements toward any prospective Eldfast customer or identifiable prospective class of third persons. The record shows that given Eldfast's past successes in Europe, Plaintiffs had a valid business expectancy with an identifiable class of prospective customers of chimney lining and repair products in the United States. (Pl.'s Ex. 1, Kikson Aff. ¶¶ 4-5.) Further, there are sufficient facts in the record from which to infer that UL knew of Plaintiffs' business expectancy with the prospective class of customers and knew that others rely on the UL mark. (Def.'s LR 56.1(a)(3) ¶¶ 3-7, 16.) At least one of UL's employees does not consider it unusual for people to call him to ask if a product is UL-listed. (Pls.' Ex. 11, Zimmerman Dep. at 121.) UL states that it publicly discloses the products it has certified or listed. (Def.'s LR 56.1(a)(3) ¶ 136.) The record also shows that UL did in fact disclose that Eldfast was not UL-listed to Plaintiffs' competitor and that such information was then posted on a website for a chimney sweep discussion group. (Pls.' Ex. 11, Zimmerman Dep. at 121-25.) As discussed above with regard to Plaintiffs' fraud claim, triable issues exist as to UL's intent regarding the testing of the Eldfast product, which also factors into UL's intent regarding its statement that Eldfast was not UL-listed. Lastly, there are facts in the record as to the damages Plaintiffs incurred as a result of UL's statement that Eldfast was not UL-listed. (Pls.' LR 56.1(b)(3)(B) ¶¶ 96, 97, 99.) At trial, UL may successfully prove that such a statement was justified. However, based on the record now before the Court, that remains an issue for the trier of fact.

### E. Defamation *Per Se*

"To prove defamation, a plaintiff must show (1) the defendant made a false statement about the plaintiff, (2) there was an unprivileged publication to a third party with fault by the defendant, and (3) the publication damaged the plaintiff." *Parker v. House O'Lite Corp.*, 756 N.E.2d 286, 291-92 (Ill. App. Ct. 2001). "A statement is considered defamatory if it tends to cause such harm to the reputation of another that it lowers that person in the eyes of the community or deters third persons from associating with him." *Van Horne v. Muller*, 705 N.E.2d 898, 903 (Ill. 1998). "Certain limited categories of defamatory statements are deemed actionable *per se* because they are so obviously and materially harmful to the plaintiff that injury to the plaintiff's reputation may be presumed." *Id.* Statements which "prejudice a party, or impute lack of ability, in his or her trade, profession or business" are deemed actionable *per se*. *Id.*

UL argues that Plaintiffs have no proof that UL made any alleged defamatory statements because UL's employees deny making any. However, the record shows that UL's employee Robert Zimmerman disclosed to one of Eldfast's competitors that Eldfast was not UL-listed. (Pls.' Ex. 11, Zimmerman Dep. at 121-25.) Plaintiffs have raised triable issues as to whether UL accurately tested the Eldfast product and whether UL knew it was not testing the Eldfast product accurately. Thus, there is sufficient evidence from which a reasonable jury may conclude that UL's statement that Eldfast was not UL-listed was false. Of course, UL may establish at trial that its statement is reasonably capable of an innocent construction, *see Parker*, 756 N.E.2d at 294-95, was true or substantially true, *see id.* at 296, or is subject to a qualified privilege, *see id.* at 298-99. However, on summary judgment, the Court cannot determine the applicability of these or other defenses based on disputed facts in the record before it. Accordingly, the Court denies the motion for summary judgment as to the defamation claim.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part UL's motion to strike portions of Jean Kikson's affidavits [doc. no. 69] and grants in part and denies in part Underwriters Laboratories' motions for summary judgment [doc. nos. 46-1, 47-1]. With regard to the summary judgment motions, the Court: (1) grants the motion based on Stewart's lack of standing; (3) grants the motion as to the conspiracy claim; and (4) denies the motion as to the negligence, fraud, tortious interference with prospective economic advantage and defamation claims. In response to the summary judgment motion, Plaintiffs have withdrawn their breach of confidentiality claim. Parties shall be prepared to discuss the deadline for the final pretrial order and the date for trial at a status hearing set for 9:30 a.m. on April 8, 2005.

**SO ORDERED**             **ENTERED:**

MAR 3 1 2005

*[signature]*
HON. RONALD A. GUZMAN
United States Judge