

**FILED**
**JULY 20, 2007**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

CERTIFIED COPY



# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 06-3766

F:A J KIKSON, a Swedish corporation,
JEAN KIKSON, a foreign citizen,
and KEVIN STEWART,

            *Plaintiffs-Appellees,*

v.

UNDERWRITERS LABORATORIES, INCORPORATED,
a non-for-profit Delaware corporation,

            *Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 C 8265—**Ronald A. Guzman,** *Judge.*

ARGUED MAY 2, 2007—DECIDED JUNE 28, 2007

FILED
JUL 2 0 2007
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

Before EVANS, WILLIAMS, and SYKES, *Circuit Judges.*

EVANS, *Circuit Judge.* Jean Kikson is the inventor of Eldfast, a ceramic-based chimney lining with an excellent sales record in Europe. Eldfast was manufactured and marketed, beginning around 1992, by Kikson's company, F:A J Kikson, a Swedish corporation. Kikson's customers included masons, chimney sweeps, and others connected in some way to the chimney business. Although apparently very successful in Europe, where Kikson's profit margin on sales of Eldfast was in the neighborhood of 80

percent, problems—and this lawsuit which resulted in a jury verdict for $6,300,000—followed his attempt to move into the American market in 2000.

Kikson's problems started when he contracted with Underwriters Laboratories, Inc. (UL)—a nonprofit company that provides a "Good Housekeeping"-type seal of approval to products that meet its standards—to evaluate and certify Eldfast for the U.S. market. UL made a series of mistakes and generally botched the testing process.

Kikson claimed UL committed fraud, tortious interference with his business prospects, negligent misrepresentation, and defamation as a result of certain statements and omissions it made while evaluating Eldfast. A jury found for UL on the fraud and defamation claims and for Kikson on the tortious interference and negligent misrepresentation claims and awarded Kikson $3 million in punitive damages and $3.3 million in lost profits. UL, obviously distressed by this verdict, appeals.

UL is the biggest player in the U.S. safety testing industry, providing different types of certification for a wide variety of products. The broadest and most common is the "UL Listing," which signifies that representative samples of a given product meet its published safety standards. Getting a Listing gives a company the right to use a unique "UL Listed" mark. A "UL Classification," which also comes with a corresponding mark, demonstrates that a product is approved for specific uses or under limited or special conditions.

Kikson contracted with UL in August of 2000 to have Eldfast evaluated for a Listing as a chimney liner under the applicable standard, UL 1777 (or so they thought—

more on that later).[1] UL scheduled Eldfast's first test for October at the Building Services Research and Information Association (BSRIA) in London.

Kikson and his team, excited about bringing Eldfast to the United States market, decided to pitch it to the chimney industry before testing started. A company called Landy Vent USA (owned and operated by Kevin Stewart and Eric Bramfitt) offered to help Kikson launch the campaign in the United States. Landy Vent would act as the general agent, exclusive importer, and distributor. Around September of 2000, Landy Vent began advertising Eldfast at trade shows for chimney sweeps.

One brochure passed out at these conventions jumped the gun by proclaiming "At last a UL listed product that works *and* makes the professional sweeps life easier!" on the front page. The second page clarified that Eldfast was in the *process* of getting its UL Listing and that it would be completed very soon ("Eldfast is currently going through its UL. Testing program and will soon be *fully listed* to UL. 1777") (emphasis in original). Before testing began, then, Kikson and Landy Vent represented to potential customers that Eldfast was already Listed (or almost Listed) and could go to market very, very quickly. The response at the trade shows was quite favorable, and some 120 or so people expressed interest in the product.

The first Eldfast evaluation, however, was not as successful as Kikson and Landy Vent had hoped. Robert Zimmerman, a UL engineer, and Kikson were present at

---

[1] The contract stated UL had "no obligation or liability for damages, including but not limited to consequential damages, arising out of or in connection with the use of, inability to use, or delay in receipt of the information resulting from this investigation." Given this term, it's not surprising that Kikson didn't sue UL under contract law.

the October 2000 BSRIA test. Zimmerman initially noted and fixed several problems with the setup (for example, some of the thermocouples were improperly connected). Kikson complained that the chimney was built out of "engineered" rather than common brick (although engineered brick was OK by UL's standards). According to him, the atypical brick could skew Eldfast's results. He pointed this out to Zimmerman, who was interested but did nothing about it. Eldfast failed the test. Zimmerman acknowledged that the type of brick used was less than ideal in a subsequent letter. He told Kikson to bring Eldfast to the United States for retesting at UL's Northbrook, Illinois, facility.

Zimmerman, who had a full workload, then passed the project off to Raymond Sanders, a junior engineer. Sanders worked with brick mason Daniel Fiocchi to prepare a test chimney for a February 2001 test in Northbrook. In the meantime, Landy Vent continued to promote Eldfast.

There were several problems with Fiocchi's February chimney. Most notably, the mortar joints were four times bigger than specified in the UL 1777 guideline. Kikson called them "hilarious" at trial and commented at the time of testing "they sure do things big in America!" The chimney cured for less than the industry standard time of 28 days (though UL does not specify a particular curing time). Also, there was zero inches of clearance between the chimney and the ground instead of the 1-inch clearance Kikson requested (UL 1777 allows either one).

Additionally, a promised chimney cap was not supplied by UL, and Kikson had to buy one at a local Home Depot store. The only cap he could find was too small and did not allow enough heat to escape. When the test was run, the chimney's temperature readings were too high. Kikson, while angry about the mishaps, agreed to have UL perform more tests on the same chimney in March.

Problems surfaced again, including UL's failure to control the ambient temperature in the room as required by UL 1777. Eldfast also came up short during the March test.

Afterwards, UL offered to build a new chimney that complied completely with UL 1777 and with Kikson's specific instructions. If Eldfast passed, the chimney would be free. If it failed, he would have to pay for the test. Kikson declined the offer.

Kikson could have walked away at this point and cut his losses, but he elected to take a different approach. He revealed to Zimmerman on or about March 22, 2001, that Eldfast did not have certain properties UL 1777 required (emphasis in original):

> Hello Bob!
>
> I have been thinking a lot about the testing that we have done and it seems to me that there are a few things that we have been approaching the wrong way, (at least I have), so it is nothing that I hold you responsible for in any way.
>
> First of all, Eldfast is not a "Liner" in the traditional way .... Eldfast is a *repair material*, and it does not in its present chemical structure have an aim for *insulative properties.* It is designed mainly to do four things: to *reinforce*, to *withstand high temperatures*, to add *acid resistance*, and to *seal cracks and fill fallen out joints*, and that's it! It will simply seal and repair an already existing chimney and give it better properties than it had before. But not necessarily make it less heat conductive.
>
> So with that in mind I was reading the 1777 test procedure description and found that it all deals with thermal conductivity.
>
> Eldfast is a material that is used to repair, (with an excellent result), already existing chimneys! Also to

do this without dramatically reducing the area of the flue. This is how it has been tested earlier in Europe and in Scandinavia. Always with a very good result. It is now very clear to me that this is what we should have done in the first place! And I feel that I should kill myself for not thinking of this before!

. . . .

This is not in any way a complaint, and I want to make that very clear, but rather a plea to you, to test Eldfast for what it is designed, and not for something else. . . . I also ask that if it is possible to find a "space" under which to test Eldfast I beg of you to find it.

Eldfast is a repair material and not an insulation let's give Eldfast a fair chance to do what it actually can do, and not again and again determine what it cannot do. Simply because it is not designed to do it. If the basis for evaluation of materials like Eldfast does not exist in UL 1777 at the moment, and if there are no standards for it, I personally think that it is something that needs to be implemented in your range of tests, because materials like this is definitely a "coming thing" . . . .

As a result, Kikson and UL's staff agreed to meet in April of 2001 to create a special category for Eldfast and plan out a new series of tests. The parties disagreed about whether UL anticipated that this new phase would result in a UL Listing or a narrower UL Classification for Eldfast. The record shows both terms used, often interchangeably. The new category, tentatively called UL 1777A, would be very similar to UL 1777 but would not test for insulative properties.

The first run under the new protocol was scheduled for August 2001 on a four-foot chimney. Bramfitt was present for Landy Vent. Things got off to a bad start when UL

initially miscured the Eldfast material. As a result, part of the Eldfast lining bubbled, pulling away from the chimney surface. UL offered to restart from scratch, but Bramfitt stated "this is what Eldfast was designed to do" and scraped off and relined the bubbled portion. The chimney was allowed to cure and the tests were rerun on August 30. There was conflicting testimony as to whether "hollow sounds" UL identified (indicating that Eldfast failed to adhere to the chimney surface) were actually heard or were fabricated after the fact. The noises prompted another round of retesting.

UL rescheduled testing for November 2001. Two six-foot chimneys were prepared—one with brick and mortar construction, and one lined with clay flue tiles, which are apparently common in the United States. Kikson had no problems with the brick and mortar chimney but objected to the clay flue tile chimney for two reasons: one, its opening was smaller than he'd specified, and two, the clay flue tiles were uncracked. Steven Kuscsik, UL's supervising engineer, was on-site and listened to Kikson's concerns—since Eldfast was being tested as a repair system, the tiles should be precracked before it was applied. Kuscsik countered that in the field an Eldfast dealer might well encounter both cracked and uncracked flue tiles in the same chimney. UL ran both tests. Eldfast performed well on the brick and mortar chimney but flunked on the uncracked clay flue tiles. UL tentatively approved Eldfast for Classification as a chimney repair and relining system for brick and mortar chimneys in March of 2002.

The problems with UL's testing procedures were many and varied, as our brief summary demonstrates. However, Kikson's claims in his lawsuit also target communications between UL and certain third parties during the year-and-a-half-long testing process.

Because it took longer than expected to get Eldfast certified, potential customers got understandably anxious as time went on. After all, Kikson and Landy Vent told some of them as far back as September of 2000 that Eldfast was either UL Listed or very close to it. Kikson and other chimney professionals were also members of an online chat group/listserv called Chimney-L, where people exchanged trade tips and discussed new and upcoming products. Naturally, the topic of Eldfast's testing status started coming up.

Some commenters speculated that Eldfast had already received its UL 1777 listing and/or was certified as a chimney liner (not just a reliner). On August 1, 2001, UL's Kuscsik and Zimmerman posted an entry on Chimney-L clarifying UL's position:

> It has been brought to the attention of Underwriters Laboratories Inc. (UL), that comments have been made on the Chimney-L online discussion group relative to the status of a current investigation being conducted by UL. The comments have indicated that UL has provided information regarding the results of a current investigation to a third party. This inaccurate information has then been published posted on this discussion group.
>
> We wish to point out that UL considers information relative to the status of a product investigation to be proprietary only between UL and the product submitter. UL will provide verification of Listing or Classification of a product upon request, but will not, however, provide information regarding the existence of or status of an ongoing evaluation. Verification of a Listing or Classification of a product may also be obtained by accessing UL's Web site at *www.ul.com*.

UL also received two phone calls from third parties during the course of the Eldfast tests. At least one compet-

itor called UL directly. At some point prior to August 21, 2001, Zimmerman spoke with Ken Simons, chimney distributor and Landy Vent competitor. During that conversation, Simons asked Zimmerman whether Eldfast was Listed by UL, and Zimmerman said "no." Sanders, the UL junior engineer, also had a conversation with an unnamed potential customer and told him Eldfast was undergoing testing.

Finally, after testing was finished, Kuscsik sent an e-mail to Landy Vent and Kikson about another problematic posting on the Chimney-L forum (a member again claimed that Eldfast was UL 1777 Listed and could be used to line a chimney). He reserved UL's option to clear up the misunderstanding but suggested it would be better if a correction came from Landy Vent. Stewart posted part of Kuscsik's e-mail to the Chimney-L forum on March 29, 2002:

> While the word is getting out, from reading the posting below it appears that there is a misunderstanding, at least with the person who posted the message. They state:
>
> "The Eldfast product is more expensive than Ahrens but it is Listed with UL now, to UL. 1777 standard which means it can be used to line a chimney. Seems like if you could get fast at this you could make a heap of money. Right now we reline with stainless steel when needed."
>
> As I'm sure you are aware:
>
> 1. The product is NOT Listed to UL. 1777. It was evaluated for Classification (instead of Listing), and not to UL. 1777 but to an Outline of Investigation (temporarily labeled UL. 1777A, but which will probably change to a different number before it is published).

2. Of more importance, it seems that they presume it can be used to line a chimney, instead of using a stainless steel liner. This product is NOT classified by UL for use as a stand-alone liner. It was evaluated for use as a resurfacing or repair system only, not for use as a liner where a stainless steel liner would otherwise be required.

According to Kikson, the Classification sounded the death knell for Eldfast in the United States. No effort was made to market it as a brick and mortar chimney reliner. This lawsuit followed.

Because Kikson prevailed at the trial, we will reverse only if no reasonable jury could have found that he established the elements of his claims. We must view the evidence in the light most favorable to Kikson and draw all reasonable inferences in his favor. *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 605 (7th Cir. 2006). However, despite this deferential standard of review, a mere scintilla of supporting evidence will not suffice. *Pearson v. Welborn*, 471 F.3d 732, 737-38 (7th Cir. 2006).

Illinois law applies, and the elements of a tortious interference claim under its law are: (1) plaintiff's reasonable expectancy of entering into a valid business relationship; (2) defendant's knowledge of that expectancy; (3) defendant's intentional and unjustifiable interference that induced or caused a breach or termination of the expectancy; and (4) damage to plaintiff resulting from defendant's conduct. *Voyles v. Sandia Mortgage Corp.*, 751 N.E.2d 1126, 1133-34 (Ill. 2001).

Actions that form the basis of a tortious interference claim must be directed at third-party business prospects. *Galinski v. Kessler*, 480 N.E.2d 1176, 1180 (Ill. App. Ct. 1985); *Crinkley v. Dow Jones & Co.*, 385 N.E.2d 714, 722 (Ill. App. Ct. 1978). Kikson complains that UL tortiously interfered with his business prospects by: (1) failing to

properly test Eldfast to applicable UL standards; (2) reporting to a customer that Eldfast was undergoing testing but concealing the fact that the test chimneys did not comply with UL 1777; (3) publishing an e-mail to the chimney industry providing no explanation for the delays or problems with the testing; (4) intentionally delaying and sabotaging tests; and (5) manufacturing "hollow sounds" to justify further testing.

To support a tortious interference claim, "Illinois courts have consistently held that the plaintiff must allege and prove facts which demonstrate that the defendants acted with the purpose of injuring the plaintiff's expectancies." *Panter v. Marshall Field & Co.*, 646 F.2d 271, 298 (7th Cir. 1981). Kikson offers no evidence that UL interacted with a potential Eldfast customer or competitor to purposefully disrupt Kikson's business prospects. UL's contact with third parties consisted of two e-mails to the Chimney-L group and two telephone conversations. The e-mails from Kuscsik in August 2001 and March 2002 did not intentionally interfere with Kikson's business expectancy. The first made it clear UL's policy is to provide verification of a product's Listing or Classification status upon request but not information about the status of an ongoing investigation. The second sought to correct the misconception that Eldfast was already Listed or that it was evaluated as a chimney liner rather than a reliner.

As for the two telephone calls, one received by Zimmerman and one by Sanders, neither demonstrated UL's intent to intentionally interfere with Eldfast sales. Zimmerman's truthful statement that UL had not Listed Eldfast cannot establish the third prong of tortious interference under Illinois law. *Delloma v. Consolidation Coal Co.*, 996 F.2d 168, 172 (7th Cir. 1993); *Soderlund Bros., Inc. v. Carrier Corp.*, 663 N.E.2d 1, 10 (Ill. App. Ct. 1995) ("There is no liability for interference with a prospective contractual relation on the part of one who merely

gives truthful information to another"). Sanders informed an unnamed potential Eldfast customer that the product was still undergoing safety testing. Again, conveying this truthful information (although it may have been a violation of UL's stated policy) does not make UL liable for an intentional tortious interference with Kikson's business prospects.

Simply put, Kikson has not demonstrated UL made statements directed at third-party potential customers *designed to induce* those customers not to buy Eldfast. In fact, on one level, this argument makes no sense: What interest would UL, a nonprofit testing agency, have in damaging Kikson's potential business relationships? Because Kikson only sought punitive damages on the tortious interference claim, we vacate the $3 million punitive damages award.[2]

The negligent misrepresentation claim fares no better. The elements of a negligent misrepresentation claim under Illinois law are: (1) a duty on the part of UL to communicate accurate information;[3] (2) false statements of

---

[2] Even if the tortious interference claim survived, the punitive damages award here is problematic and probably would not stand on its own. Illinois law requires that the underlying conduct must involve an element of outrage similar to that found in crime in order to support punitive damages. *Homewood Fishing Club v. Archer Daniels Midland Co.*, 605 N.E.2d 1140, 1148 (Ill. App. Ct. 1992); *see also Hiatt v. Rockwell Int'l Corp.*, 26 F.3d 761, 765 (7th Cir. 1994) (punitive damages are only warranted when the underlying tort was committed with fraud, actual malice, or a wanton disregard for the rights of others). We do not think UL's conduct here rises to that level.

[3] At least one court has determined that UL may owe the owners of the products it tests a duty to provide accurate information. *Brookshire Bros. Holding, Inc. v. Total Containment, Inc.*,
(continued...)

material fact; (3) carelessness or negligence by UL in ascertaining the truth of the statements; (4) intention to induce Kikson to act; (5) action by Kikson in reliance on the truth of the statements; and (6) damages. *First Midwest Bank, N.A. v. Stewart Title Guar. Co.*, 843 N.E.2d 327, 335 (Ill. 2006).

The "false statements of material fact" of which Kikson complains (many of which mirror the basis for the tortious interference claim) include: (1) UL held itself out as an expert when, in truth, its engineers were incompetent; (2) UL misrepresented that its test chimneys complied with UL specifications and intentionally withheld information regarding defects in the test chimneys; (3) UL misrepresented that it had created a new "standard" (UL 1777A) to test Eldfast, when in truth that standard was a "moving target"; (4) UL misrepresented that if Eldfast passed the new standard, Kikson would receive a Listing; and (5) UL manufactured "hollow sounds" during testing as a pretext for more delay.

It seems clear from the record that Kikson would have a strong case against UL for negligent testing. However, that is not what was tried here. In order to show negligent *misrepresentation*, Kikson needs to establish that UL made statements intending to induce him to act in a particular way that damaged his business prospects. *First Midwest Bank*, 843 N.E.2d at 335. The best Kikson can come up with is that UL made misrepresentations to encourage him to keep testing Eldfast.

---

³ (...continued)
No. 04-1150, 2006 WL 3095651, at * 4 (W.D. La. Oct. 27, 2006) ("This Court cannot conclude that UL had absolutely no duty to perform its tests with reasonable care."). At any rate, UL does not contest that it owes Kikson a duty.

Kikson can only prevail if the act of continuing with the testing was more harmful than calling it quits. *Price v. Philip Morris, Inc.*, 848 N.E.2d 1, 52 (Ill. 2005). By listening to UL and following through with the testing process, Kikson got Eldfast a Classification for brick and mortar chimneys under the newly developed UL 1777A—not the Listing he'd hoped for, surely, but better than nothing at all. Indeed, that Classification was a result of UL's willingness to think outside the box after Kikson revealed, well after testing started, that Eldfast did not have the properties UL 1777 required. No reasonable jury could have found that Kikson's choice to continue to work with UL on getting Eldfast certified generated $3.3 million in damages.

Of course, since we reverse judgment on the tortious interference and negligent misrepresentation claims, the lost profits award must be vacated. However, it is doubtful that the $3.3 million award could withstand independent scrutiny. Illinois courts hold that "recovery of lost profits cannot be based upon conjecture or sheer speculation." *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 515 N.E.2d 61, 66 (Ill. 1987) (citations omitted). In order to recover, a "defendant's breach must be plainly traceable to specific damages." *Id.* Per *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 420 (7th Cir. 2005), lost profits cannot represent "hopes rather than the results of scientific analysis."

To prove projected profits and sales, a plaintiff must present testimony from a qualified witness using "professional methods" to reach a "testable" dollar amount. *Id.* Here, Kikson failed to use any recognized professional method. He did not account for factors distinguishing the United States and European markets, such as population density, regulatory requirements, climate differences, pricing variables, and distribution costs. His basis for modeling future United States sales on past European

sales—that in a small field one can grow ten potatoes, while in a large field one can grow a thousand—was too simplistic. Stewart's testimony could not save the day either. Consider his commentary on projected Eldfast sales in the United States:

> We . . . were unsure of the total number of installers we would have. We were also unsure of the number of tons each installer would install, so what we were working on was pretty conservative numbers, and I think we envisaged starting the network with maybe 80 to 100 installers using anywhere between two and six ton a year, so we thought about four ton a year was a good average.
>
> . . . .
>
> Anywhere between two and a half and five million dollars, I guess. I mean, it's hard to say because the process wasn't far enough down . . . .

A reasonable jury could not have awarded $3.3 million in damages based on the record here. *Id.*[4]

We reverse the tortious interference and negligent misrepresentation verdicts and vacate the $6.3 million damages award. The case is REMANDED to the district court where judgment for UL must be entered. Costs are awarded to UL.

---

[4] Kikson's argument that UL's conduct negatively affected Eldfast sales in Europe is even more tenuous. He simply testified that European sales "dropped dramatically during 2001 and was absolutely nothing during 2002 due to the fact that I was involved in this UL testing." But he never explained *why* this was the case. Kikson failed to separate out other key factors that could have contributed to the sales decline—most notably the bankruptcy of his European distributor. *Isaksen v. Vermont Castings, Inc.*, 825 F.2d 1158, 1165 (7th Cir. 1987).

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*